UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | CAUSE NO. 5:25-cr-00388-XR |
| JAIME ALBERTO QUINTANILLA-CHAVEZ | § § § | |

**DEFENDANT'S MOTION TO SUPPRESS AND DISMISS FOR CONSTITUTIONAL VIOLATIONS**

TO THE HONORABLE XAVIER RODRIGUEZ, U.S. DISTRICT JUDGE:

This motion asks the Court to suppress the evidence and dismiss the charges against Defendant Jaime Quintanilla-Chavez, for three reasons:

- Jaime's initial warrantless seizure was unjustified and unauthorized, violating the Fourth Amendment and requiring suppression.

- Also violating the Fourth Amendment and triggering suppression, the scope of the seizure was aggressively expanded without adequate justification.

- The agents violated Jaime's due process rights by using conduct that was conscience-shocking and outrageous, requiring suppression and dismissal.

The Court should grant the motion.

**Background**

The initial complaint affidavit in this case provided that "[o]n June 20, 2025, Homeland Security Investigations (HSI), ICE Enforcement and Removal Operations (ICE-ERO), and Texas Department of Public Safety (TxDPS) were conducting surveillance at a residence on Benrus, in San Antonio, Texas[.] Database checks indicated that Jaime Albert QUINTANILLA-Chavez, with a Final Order of Removal

from an Immigration Judge, was residing at the above address." *See* Complaint Affidavit (Doc. 1) at ¶ 2. The affiant, HSI S/A Steven Fuentes, also testified at the preliminary hearing that Jaime was surveilled (and taken into custody) because he was subject to a Final Order of Removal from an Immigration Judge. *See* Preliminary Hearing Transcript at 4. But the government now concedes this claim was inaccurate: Jaime was not actually subject to a Final Order of Removal from an Immigration Judge. *See* Govt. Advisory (Doc. 14).

The affidavit then stated that at about 7:15 a.m., Jaime exited the surveilled residence and entered a white Dodge Ram towing a trailer containing construction equipment, and that both license plates for the truck and trailer were expired. *See* Affidavit at ¶ 2; Prel. Hrg. Tr. at 16-17. But at the bond appeal hearing, the government disavowed this basis for the seizure as well. *See* Bond App. Tr. at 8.

Unmentioned in the affidavit, the government (also at the bond appeal hearing) conceded that the real reason for surveilling Jaime was a tip. *See* Bond App. Tr. at 5-6. Specifically, on June 12, 2025, a woman reported to HSI in Alpine, Texas, that Jaime was in the country illegally and had committed unspecified domestic violence against her daughter. *See id.* Jaime had no A-file, and the government claims that agents did "research" and could not confirm that Jaime was a citizen or otherwise in the country legally. *See id.* at 6-7. The government only claims the stop was a probable cause stop to investigate suspected immigration offenses, *see id.* at 7-8, not the domestic concern, *id.* at 6.

The agents then  stopped the truck Jaime was driving. He was the sole occupant, other than his weenie dog, Rocky. The agents, not clearly uniformed but armed, numbering 5-7, many wearing militaristic bulletproof gear, commanded Jaime to roll his window down. Absurdly, Fuentes testified the agents wanted to remove him from the truck because they were concerned for their safety due to Jaime talking on his phone. *See* Prel. Hr. Tr. at 7; Bond App. Tr. at 7. It turns out Jaime was asking a friend to come pick up his dog. *See* Bond App. Tr. at 15, 25. Jaime's friend was on apple's video messaging app and could see men aiming a gun at Jaime and yelling at him. *See id.* at 25.

When Jaime did not initially roll down his window, agents decided to break the window, with one agent asking for a "window break" in the first minute of the primary body cam video. *See* Def. Exh. 1 (Primary Body Cam) at 00:59.[1] HSI Agent William Carl (a different agent) then approaches the driver's side with his own window-breaking tool. The relevant body cam slightly moves, making it difficult to see, but as Carl is about to break the window, the truck moves forward. *See id.* at 02:24. Carl breaks the window as the truck moves, causing a minor cut on his arm from the broken glass.

Jaime then backs back up. The narrative reports make much of Jaime's vehicle hitting a law enforcement vehicle, but no violent collision is apparent whatsoever on the body cam. *See id.* at 02:24-02:48. Instead, it appears that at some point, either

---

[1] Def. Exh. 1, the primary body cam video, is only 12:25 minutes long. Def. Exh. 2, the secondary body cam video, is only 06:44 minutes long. This will be submitted to the Court and the district clerk's office in a thumb drive after filing.

when he is violently being removed from the car by law enforcement or when Jaime's truck backed up, the trailer barely bumped the front bumper of Carl's vehicle, parked just behind, causing very minor damage. *See id.* at 02:50.

The body cam agent brandishes a firearm at Jaime. *Id.* at 02:56. Carl approaches, rips away the window shards, and opens the door, after which multiple agents violently pull Jaime out of the vehicle, pin him to the ground while he screams, and aggressively handcuff him. *See id.* at 03:05-05:41. Bleeding from the head and painfully handcuffed, Jaime attempts to speak to officers in his native Spanish, but Carl tells him to "Shut your fucking mouth." *See* Def. Exh. 2 (secondary body cam) at 03:11. Then Carl tells him again: "Shut your mouth." *Id.*

Because Carl sustained a minor cut on his arm from the glass, he himself broke, the government has decided to charge Jaime with inflicting bodily injury by assaulting a federal officer. *See* Bond App. Tr. at 10-11. The Court should dismiss the charge and suppress the evidence.

### Argument

**1) The agents violated the Fourth Amendment by conducting the warrantless traffic seizure without justification or authorization.**

When the agents traffic-stopped Jaime with no warrant, they lacked reasonable suspicion (or probable cause) to do so. A warrantless search or seizure is presumptively unreasonable, "subject to certain narrow exceptions." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). One exception—announced in *Terry v. Ohio*, 392 U.S. 1 (1968)—allows officers to conduct a brief investigatory stop of an individual if they have reasonable suspicion to believe the person is engaged in

criminal activity. *Alvarez*, 40 F.4th at 345.[2] The government bears the burden to justify a warrantless search or seizure. *See United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017). It cannot meet thar burden here.

### a) Any concern about an immigration offense did not justify Jaime's warrantless seizure.

The government claims the seizure was exclusively "a probable cause stop to investigate whether or not he was illegally present in the United States." Bond App. Tr. at 7. This information came (unmentioned in the probable cause affidavit) from a tip. *See* Bond App. Tr. at 5-6. Specifically, on June 12, 2025, a woman reported to HSI in Alpine, Texas, that Jaime was in the country illegally—with no apparent description of how the woman knew of Jaime's alleged status. *See id.* Jaime had no A-file, and the government claims that agents did "research" and could not confirm that Jaime was a citizen or otherwise in the country legally. *See id.* at 6-7. The government cannot prove that this basis supplied reasonable suspicion or probable cause to seize Jaime.

To start, the tip did not supply adequate reasonable suspicion. The tipster, though identified, was not an individual known to have provided accurate information to officers in the past. And it does not appear officers corroborated much of anything regarding the tip. Courts typically evaluate a set of factors to determine if a tip is adequately corroborated:

---

[2] The Fifth Circuit also treats traffic stops like *Terry* stops. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).

(1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale.

*United States v. Wright*, 57 F.4th 524, 534 (5th Cir. 2023) (cleaned up). There is no evidence that officers evaluated the tipster's credibility or reliability, the current discovery only supplies vague assertions of wrongdoing and illegal presence, there is no evidence that agents verified any details (other than their "research" showing an alleged lack of proof of valid presence), and there is no evidence for when the tipster formed her basis of knowledge, so there is no way to know if her hunches or claims were stale. *See United States v. Martinez*, 486 F.3d 855, 861–62 (5th Cir. 2007) (finding tip inadequately corroborated in part because of lack of evidence about the relevant corroboration factors). Discovery does indicate officers made some attempt to corroborate the tip by eliciting the same information from the same tipster—but well after the seizure challenged here. Besides, calling the same individual who provided the tip does not constitute corroboration, as it does not independently verify the information through external evidence or reliable sources. Regardless, any post-seizure corroboration cannot retroactively validate the seizure, since reasonable suspicion must exist "at the moment of the seizure[.]" *Terry*, 392 U.S. at 22.

Looking to the moment of the seizure, it appears that about the only effort to corroborate came from the agents' "research" that did not confirm that Jaime, who had no A-file, was a citizen or otherwise in the country legally. *See* Bond App. Tr. at 6-7. Yet that is a weak basis for a warrantless seizure (especially one as intense as

this one, discussed below). An alleged "absence of evidence is not evidence of absence," *Knox v. Cain*, No. 5:13-CV-241-KHJ, 2023 WL 4053413, at *3 (S.D. Miss. June 16, 2023), especially where the officers likely could not be certain whom they are actually surveilling. Further, Jaime holds the government to its burden to prove that whatever "research" method agents used—to support this warrantless seizure—was likely to provide reliable results. *See United States v. Broca-Martinez*, 855 F.3d 675, 678-681 (5th Cir. 2017) (government showed database check for lack of vehicle insurance was reliable evidence of such a lack). Such a reliability claim is especially problematic here, where there is evidence of a mistaken belief in a nonexistent order of removal. And to the extent they are relevant, none of the immigration-stop factors in *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975), are present here.

Any hunch about an immigration offense did not justify the seizure here.

### b) No state law concerns justified the seizure either.

**i) <u>Waiver.</u>** No alleged violations of state or local laws justified the seizure. After misstating that Jaime had an order of removal, the affidavit of probable cause went on to state that both license plates for the truck and trailer were expired. *See* Affidavit at ¶ 2; Prel. Hrg. Tr. at 16-17. However, at the bond appeal hearing, the government disavowed this basis for the seizure too, claiming the agent "misrepresented what was going on." *See* Bond App. Tr. at 8. Instead, the government claimed the stop was only a probable cause stop to investigate suspected immigration offenses. *See id.* Accordingly, the government has waived the ability to invoke expired plates as a basis for the seizure.

The same is true for the tip that Jaime had committed unspecified domestic violence against the tipster's daughter (with no apparent specific description of the nature or time of such occurrences). *See id.* The government only claims the stop was a probable cause stop to investigate suspected immigration offenses, *see id.* at 7-8, with the AUSA having claimed to the Court, "I don't know anything about the allegations of domestic violence," *id.* at 6. Thus, the government has waived the ability to invoke this vague domestic concern as a basis for the seizure too. And regardless, the tipster's allegation of domestic concern still suffers from the same corroboration problems as those discussed above, with apparently no pre-seizure corroboration whatsoever.

**ii) <u>Authority.</u>** Alternatively and additionally, the Court should not consider either of these state-law bases in any event, based on a question the Court asked the parties to brief: Can federal agents conduct seizures based on alleged violations of state law? The answer to this question—whether a "government's agents can conduct searches or seizures to enforce a different government's law"—is "remarkably unclear." *See* Orin S. Kerr, *Cross-Enforcement of the Fourth Amendment*, 132 Harv. L. Rev. 471, 473 (2018) (providing overview of muddled case law and opining that the correct rule should be that Sovereign A can only search or seize based on suspected violations of Sovereign B's law if Sovereign B's law authorizes Sovereign A agents to do so). In this context, the Fifth Circuit seems to permit federal agents to seize for alleged state-law violations in only two instances. One is if a specific federal statute authorizes the specific type of federal agent to seize for the alleged state-law violation.

*See United States v. Sealed Juv. 1*, 255 F.3d 213, 216 (5th Cir. 2001) ("[T]he government conceded that no federal statute gives a Customs agent the authority to arrest someone for a traffic violation."). The other way is if a specific state law (in the state where the federal agent is acting) authorizes the federal agent to seize for a state-law violation. *See id.* at 217–18; *United States v. Johnson*, 815 F.2d 309, 313–14 (5th Cir. 1987).[3]

As the government bears the burden to justify a warrantless seizure, Jaime holds the government to its burden to prove that a federal or state law authorized these specific types of federal agents to seize for alleged state-law violations. Jaime does note, however, that Texas's citizen-arrest statute would not justify the seizure here. *See Sealed Juv. 1*, 255 F.3d at 216 (relying on this statute). Texas's statute only authorizes a citizen arrest "when the offense is committed in [the citizen's] presence or within his view, if the offense is one classed as a felony or as an offense against the public peace." But the domestic violence claim was not an offense committed in any of the arresting agents' presence. And expired license plate tags do not qualify as "an offense against the public peace," because such an offense requires threatened or actual violence or at least actual reckless or drunk driving conduct. *See Kunkel v. State*, 46 S.W.3d 328, 330–31 (Tex. App. 2001). The federal agents lacked Fourth Amendment authority to seize Jaime.

---

[3] Counsel was only able to find one general allowance—for a federal agent to stop based on state law—but that only permitted roving Border Patrol officers to stop for state law violations. *See United States v. Nelson*, 990 F.3d 947, 956 (5th Cir. 2021); *United States v. Perkins*, 352 F.3d 198, 200 (5th Cir. 2003)). But this case involved no Border Patrol officers and this stop was not a roving Border Patrol stop.

**2) Even if the agents had a valid basis to seize Jaime, the intensity of the seizure was unjustified, independently requiring suppression.**

**i) <u>De facto arrest.</u>** Under *Terry*'s reasonable suspicion standard, when a stop is valid at its inception, courts ask if "the office's subsequent actions were reasonably related in scope to the circumstances that justified the stop" or to dispelling new reasonable suspicion that arises during a valid stop. *United States v. Brigham*, 382 F.3d 500, 506-07 (5th Cir. 2004) (en banc). An investigatory seizure can be expanded in two ways requiring commensurate reasonable suspicion. One is an expansion of duration. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015). The other—relevant here—is an expansion of intensity beyond the level of force justified by the officers' suspicions. *See Florida v. Royer*, 460 U.S. 491, 501–02 (1983); *United States v. Zavala*, 541 F.3d 562, 579-80 (5th Cir. 2008) (finding unreasonable expansion of seizure in part because the defendant was "handcuffed, placed in a police car, transported to different locations, and was not free to leave"). Put different, "the investigative methods employed [during a brief investigatory seizure] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion," *Royer*, 460 U.S. at 500 (cleaned up).

Courts sometimes refer to such a seizure as a warrantless de facto arrest without probable cause. *See Zavala*, 541 F.3d at 579. The real question, though, is simply one of reasonable scope: "The court must determine case by case whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *United States v. Sanders*, 994 F.2d 200, 206–07 (5th Cir. 1993); *see also El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459 n.2 (8th Cir. 2011) (whether

framed as a de facto arrest or not, unwarranted handcuffing still violates the Fourth Amendment). The government cannot prove the ongoing validity of this seizure's scope. *See Royer*, 460 U.S. at 500 (government bears burden).

At the moment Agent Carl raised his window break tool to smash Jaime's window, the agents had expanded the scope of the stop without commensurate reasonable suspicion. To see why, compare this case to *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). There, a grandmother driving her 2-year-old granddaughter was pulled over for speeding, and the grandmother told the officer the speeding claim was "bullshit." *See id.* at 161. The officer asked her to step out, and she refused. *Id.* The officer said he would call child protective services to pick up her granddaughter, and she responded by rolling up her window and calling family members. *Id.* The police chief arrived and told her to roll down her window or he'd break it, but the grandmother refused as she was waiting for her husband to come pick up the child. *Id.* at 161-62. The chief then broke the window with a flashlight, grabbed her through the window and opened the door, and the chief and the other officer then threw her up against the vehicle, resulting in a blow to her abdomen, and then handcuffed her and led her to their cruiser. *Id.* at 162.

The Fifth Circuit reversed a grant of the defendant-officers' motion for summary judgment on an excessive force claim, finding that—in light of the minor offense (based on a dubious allegation) being investigated, the fact plaintiff was not resisting or fleeing when the force was resorted to, the fact she was waiting for family to take custody of the child, and the quick resort to force without much effort to

11

negotiate—a reasonable jury could find that the degree of force was unjustified. *See id.* at 167-68.

This case is much alike. As in *Deville*, all the agents were investigating was a dubious claim of a minor offense: a vague tip that Jaime, at some point in the past, was supposedly not legally present, which the agents supported with unspecified "research" simply showing a lack of evidence on the question. Like *Deville*, Jaime posed little threat to the agents: he was a young man with no criminal history, short and slight in stature, alone in his truck with his weenie dog.

Also like *Deville*, the officers employed an unreasonable show of force: to seize a non-dangerous suspect for a minor alleged offense, a band of five to seven officers driving multiple unmarked vehicles converged on Jaime's truck. The agents, each one much larger than Jaime, were armed, many wearing tactical militaristic gear like bullet-proof vests. Speaking a mixture of English and Spanish, the agents demanded that Jaime open his truck window. Comparable to *Deville*, Jaime was using his phone to video-chat with a friend, to ask the friend to come pick up his dog. The friend saw men "pointing the gun at [Jaime] and yelling at him." *See* Bond App. Tr. at 15, 25. Absurdly, S/A Fuentes testified the agents wanted to get Jaime out of the vehicle because Jaime's act of speaking on the phone made them concerned for officer safety, *see* Prel. Hr. Tr. at 7, a claim this Court has already rightly rejected as uncredible: "That's quite a stretch. And I'm not believing that[.]"). Bond App. Tr. at 7.

When Jaime did not immediately obey the commands to roll down his window (due to asking his friend to get his dog), multiple agents decided to break the window.

Much like the officers in *Deville*, the agents chose to resort to such violence quickly and with little attempt to negotiate, with one agent requesting a "window break" less than a minute into the main body cam video. *See* Def. Exh. 1 at 00:59. An agent even said, "I'm gonna get my window break, I ain't got time for this." *See id.* at 01:37. Agent Carl then approached Jaime's driver's side window, where Jaime was sitting, and raised a window break tool to strike.

At this snapshot in time, the agents had already expanded the scope of the stop without commensurate reasonable suspicion or probable cause. *See Deville*, 567 F.3d at 167–68 (reversing summary judgment grant on similar reasonableness-of-force standard used in excessive force claims); *see also Zavala*, 541 F.3d at 579-80 (Fifth Circuit reversing suppression denial in part by finding unreasonable expansion of seizure where intensity and length unjustified by suspicions). The scope of the agents' seizure was unjustified by adequate suspicion.

**ii) <u>Excessive Force.</u>** Alternatively, assuming arguendo the agents had probable cause to arrest when Carl raised his tool to break Jaime's window, the agents engaged in excessive force in violation of the Fourth Amendment.

Even when an arrest is justified, the manner of the seizure can still amount to excessive force in violation of the Fourth Amendment. *See Sam v. Richard*, 887 F.3d 710, 714–16 (5th Cir. 2018). An officer uses excessive force if the suspect sustains "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need[,] and [] (3) the force used was objectively unreasonable." *Id.* at 713 (cleaned up). "*Any* force found to be objectively unreasonable necessarily exceeds the

*de minimis* [injury] threshold." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (emphasis in original; citation and internal quotation marks omitted). "[E]ven relatively insignificant injuries and *purely psychological injuries* will prove cognizable when resulting from an officer's unreasonably excessive force." *Sam*, 887 F.3d at 713 (5th Cir. 2018) (emphasis added; cleaned up). And when analyzing the reasonableness of nondeadly force, courts pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Like the *Deville* case, the agents here engaged in excessive force when Carl raised his tool to break Jaime's window. In this case and *Deville*, officers were investigating minor offenses based on dubious allegations, neither suspect resisted beyond not exiting or rolling down the window, both were waiting for another to arrive to take custody of a helpless occupant, the suspect posed no danger to the officers, and the officers quickly chose to break the window with little effort to negotiate, terrifying each driver. *See id.* at 167-68. The agents violated the Fourth Amendment at this point.

True, Jaime's truck then moved forward and back again, but the Fourth Amendment violation had already occurred, when Carl raised the tool to break the window. Regardless, even taking into account the truck moving  forward and back, the agents still used excessive force in violation of the Fourth Amendment, by ripping

the window out, violently wrenching Jaime from the vehicle, gang-tackling and pinning him to the ground while he screamed in pain, causing a bleeding wound to his head, and aggressively handcuffing him to the point he kept asking for the cuffs to be loosened, at which point Carl told him "Shut your fucking mouth." *See* Def. Exh. 2 at 03:11. Though the driver in *Deville* did not move her vehicle like Jaime's truck moved, the agents here engaged in a much more violent seizure, and yet the Fifth Circuit in *Deville* found the plaintiff stated a viable claim of excessive force. *See Deville*, 567 F.3d at 167-68. The Court should find excessive force, even considering the movement of Jaime's truck.

**iii) <u>Suppression.</u>** The agents' seizure—either illegal at its inception or unjustifiably expanded in scope—should lead to suppression of the evidence against Jaime. The government has informed the Court that the only basis for the assault prosecution is the fact the truck lurched forward, resulting in a cut to Agent Carl's arm. *See* Bond App. Tr. at 10-11. Yet the agents' illegal seizure—whether invalid at inception or invalid in its expanded scope—preceded and led to the truck lurching forward. And the Fourth Amendment exclusionary rule applies to observations that law enforcement officers make "in the course of . . . unlawful activity." *See United States v. Crews*, 445 U.S. 463, 470 (1980). Accordingly, the Court should suppress all observations and recordings (visual or audio) of the alleged resistance. *See Wong Sun v. United States*, 371 U.S. 471, 479-88 (1963) (Defendant Toy fled from agents, who illegally entered his home and chased him down and arrested him, after which he made incriminating statements, which in turn led to the discovery of drugs, and the

Supreme Court held the statements and physical evidence were the fruit of the illegal entry and arrest.). Lacking this evidence, the government will not be able to convict at trial.

Of note, if the court finds the seizure was a probable-cause-supported arrest carried out with excessive force, suppression should still apply. *See* LaFave, 3 Search & Seizure § 5.1(d) Use of force (6th ed.) (Oct. 2022 Update) (opining that excessive force in criminal cases should lead to suppression, especially where the force is "directly a part of the act of acquiring the evidence"); *Delaney v. Giarrusso*, 633 F.2d 1126, 1129 n.2 (5th Cir. 1981) (noting LaFave's argument that "the use of excessive force in arresting is in violation of the Constitution and thus deserving of deterrence by the exclusionary rule").

### 3) The agents violated due process by using conscience-shocking and outrageous conduct, justifying suppression and dismissal.

In *Rochin v. California*, the Supreme Court held that due process bars the government from prosecuting a defendant if its agents engage in conduct that "shocks the conscience." *See* 342 U.S. 165, 172 (1952). There, suspecting that the defendant was selling narcotics, officers forcibly entered the defendant's home without a warrant, where they saw the defendant eat two capsules, after which the officers tried to forcibly remove the capsules from the defendant's mouth while the defendant engaged in "resistance," and then (when that failed) they took him handcuffed to a hospital, where they pumped his stomach against his will until he vomited up the capsules. *See* 342 U.S. at 166. Using the capsules (of morphine) as key evidence against the defendant, the state convicted him. *Id.* at 166-67. The Supreme Court

reversed the conviction, holding that the officers engaged in "conduct that shocks the conscience," *id.* at 172, so the state obtained the conviction "by methods that offend the Due Process Clause," *id.* at 174.

The agents here also engaged in conduct that shocks the conscience, similar to how the officers in *Deville* failed to obtain dismissal of the excessive force claim. As in *Deville*, the suspected offense was minor and based on dubious proof, when Carl raised his tool to break the window Jaime had not resisted, Jaime was just waiting for another to take custody of a helpless occupant, Jaime presented no genuine officer safety concerns, and the officers quickly chose to break the driver's side window with little effort to negotiate, causing terror. *See id.* at 167-68. This conduct shocks the conscience.

And even taking into account the truck moving forward and back, the agents responded with yet more conduct that shocks the conscience, tearing the window out, violently pulling Jaime from the vehicle with multi-officer force, pinning him to the ground while he yelled, causing a bleeding head wound, and painfully handcuffing him, and telling him to shut his fucking mouth. *Cf. Deville*, 567 F.3d at 167-68. This conduct also shocks the conscience, like the Supreme Court held the *Rochin* officers violated due process in the way they overcame a suspect's "resistance." *See* 342 U.S. at 166, 172.

Alternatively and additionally, the agents also violated due process by engaging in outrageous government misconduct. The Fifth Circuit reviews such claims by analyzing "the totality of the circumstances with no single factor

controlling." *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981). To find outrageous government conduct, there must be government overinvolvement and a defendant who did not actively participate. *See, e.g., United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003). In *Tobias*, for instance, DEA agents established a chemical supply company to detect the manufacture of illicit drugs, urged the defendant to manufacture amphetamines after he had cancelled his order for supplies to produce cocaine, and advised him on how to do so. *See id.* at 383-84. The Fifth Circuit held the case presented the "outer limits" beyond which outrageous conduct would be found, but found that under the totality of the circumstances, the defendant was a predisposed, active participant in a scheme to manufacture an illegal drug and was motivated solely by the desire to make money. *See id.* at 387.

Yet here, the government was more than overinvolved in the alleged offense: the agents' own conduct—engaging in absurd tactics to seize a non-dangerous suspect for a minor offense—caused the alleged offense. And Jaime did not actively participate in a planned-out crime like the vast swath of defendants whose outrageous-conduct claims fail; instead, Jaime simply had an instinctive reaction to absurd and terrifying agent actions. If *Tobias* sets the outer limits of outrageous conduct, this case goes past them. *Cf. United States v. Twigg*, 588 F.2d 373, 380-81 (3d Cir.1978) (finding outrageous government conduct, but by entrapment).

To punish the officers' "brutal conduct" in *Rochin*, the Court found it necessary to suppress the evidence. *Id.* at 173-74. Doing nothing "would be to afford brutality the cloak of law." *Id.* at 173. The Court should do the same here, suppressing all

evidence against Jaime. In addition, the Court should dismiss Jaime's charge with prejudice. The Supreme Court has recognized that there may be cases "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973) (citing *Rochin*, 342 U.S. 165). Here, the agents' conduct meets that standard.

### 4) In ruling on the motion, the Court should consider law enforcement's inaccurate statements and omissions.

When making credibility determinations and factual findings to rule on this motion, the Court should weigh the inaccurate statements and omissions by law enforcement apparent in this case. These include the inaccurate statements and omissions in the probable cause affidavit and the preliminary hearing testimony, as noted by the Court. *See* Bond App. Tr. at 31-32. And even after being admonished by the Court for inaccuracies, *see id.*, S/A Fuentes wrote in a report on 7/15/25 that Jaime had a final order of removal from an immigration judge—repeating the main inaccuracy that the Court had already admonished for.

### CONCLUSION

The Court should hold an evidentiary hearing and grant the motion. In connection with the requested hearing, Jaime requests that the government disclose to defense counsel at least forty-eight hours prior to the hearing any statements (including grand jury testimony) of evidentiary hearing witnesses, under Federal Rule of Criminal Procedure 26.2. Jaime also asks that the government disclose any *Brady* or *Giglio* materials within this time frame. This request is made to avoid delays

in conducting the hearing. Jaime requests the right to raise any other motions based on the facts and evidence that may arise during any evidentiary hearings in this case, as well as the right to file a supplemental brief more fully addressing the testimony given at the hearing and the applicable law.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender


//s/ MARINA THAIS DOUENAT
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, TX 78205
Tel.:(210) 472–6700
Fax: (210) 472-4454
Bar Number: 00798310
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the AUSA of record.

/s/ MARINA THAIS DOUENAT
*Attorney for Defendant*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § § | |
| v. | § | CAUSE NO. 5:25-cr-00388-XR |
| JAIME ALBERTO QUINTANILLA-CHAVEZ | § § § | |

## ORDER

For the reasons Defendant has argued, the Court **GRANTS** Defendant's motion to dismiss for the constitutional violations Defendant has urged. The charge is **DISMISSED WITH PREJUDICE**.

Alternatively and additionally, the Court also **GRANTS** Defendant's motion to suppress all evidence against him in this case, for the reasons Defendant has argued.

SO ORDERED on this the _____day of _____, 2025.


_____
XAVIER RODRIGUEZ
United States District Judge