**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | **5:25-CR-388-XR** |
| v. | § | |
| | § | |
| **JAIME ALBERTO QUINTANILLA-** | § | |
| **CHAVEZ,** | § | |
| | | |
| Defendant. | | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS AND**
**DISMISS FOR CONSTITUTIONAL VIOLATIONS**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the United States of America, by and through the United States Attorney for the Western District of Texas, and hereby files this response to Defendant's Motion to Suppress and Dismiss for Constitutional Violations (Doc. 38).

Factual Summary

At a hearing on this motion, the Government anticipates the following testimony will be elicited from U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Deportation Officer (DO) Hector Hernandez. DO Hernandez will testify that he learned about the above named defendant, Jaime Alberto Quintanilla-Chavez, on June 14, 2025 when he was emailed an HSI Tip-Line report originating from Homeland Security Investigations (HSI) in Alpine, Texas. This tip indicated the defendant was present in the United States illegally. The tip was made by a female who provided her full name, date of birth, and cell phone number. She identified the defendant by his full name, date of birth, street of residence in San Antonio, Texas (Benrus Blvd.), and cell number. She also stated the defendant had physically abused her

daughter and was stalking her. This tip included pictures of vehicles and a picture of the defendant's foreign-born Honduras Identification card containing the defendant's name and date of birth. This ID card also states (in English) "Honduran by: Birth." HSI- Alpine conducted research to corroborate the tip. HSI- Alpine consulted law enforcement databases and confirmed the information in the tip - specifically that the cell phone and address provided are linked to this defendant.

When DO Hernandez received the tip and the research by HSI- Alpine, he conducted further research. DO Hernandez referenced a database called Unified Passenger (UPAX) to determine if the defendant has had any immigration encounters in the United States. UPAX is a database operated by U.S. Customs and Border Protections. Law enforcement regularly relies on this database. This is a clearinghouse database that checks multiple databases such as: Immigration, travel data, border crossings and inspections, I-94 non-immigrant visas, Interpol, criminal history, wants and warrants, NCIC, vehicle information, and pending claims for status, immigration encounters, applications, or permissions to be in the United States. DO Hernandez also conducted research on the USCIS database called Person Centric Query Service (PCQS). The defendant nor his date of birth were in these databases.

Then, DO Hernandez contacted the female who made the HSI tip. He asked her for more details about the defendant. She confirmed the information originally provided and added that the defendant also had a white truck. She confirmed that he lives on Benrus Blvd. in San Antonio, Texas.

After all this research, DO Hernandez determined the defendant did not have any encounters with Immigration Officials, had no applications or claims for any type of visa, parole, asylum, or status to be in the United States. The defendant did not have permission allowing him

to be legally present in the United States.[1]

After determining the defendant was not legally in the United States, DO Hernandez conducted surveillance of the defendant's residence on Benrus Blvd., in San Antonio, Texas, two separate times. DO Hernandez observed a Honda and a white Dodge truck. There was a picture of a Honda attached to the tip. And the white Dodge truck would turn out to be the same vehicle the defendant was driving when he was encountered on June 20, 2025. Further research by DO Hernandez revealed both vehicles he observed were registered to the defendant. On June 19, 2025, Texas Department of Public Safety (DPS) also conducted surveillance of the defendant's house on Benrus Blvd. and observed the same two vehicles. DO Hernandez will testify that knowing all of the above, he decided that the defendant would be the target in an immigration enforcement operation the following day.

The team assigned to apprehend the defendant on June 20, 2025 consisted of Team-Lead DO Hernandez, HSI Special Agent William Carl, and three Special Agents assigned to the Criminal Investigations Division (CID) of Texas DPS. DO Hernandez will testify that teams assigned to immigration operations commonly involve 4-5 law enforcement officers, and can involve anywhere from 2-6 agents. DO Hernandez will testify that on the morning of June 20, 2025, DO Hernandez and SA Carl parked separately in their vehicles near the defendant's residence on Benrus Blvd, in San Antonio, Texas. The three DPS Agents were parked several blocks away. DO Hernandez will further testify that he was using binoculars to surveille the defendant's residence.

After sunrise, DO Hernandez observed the defendant walk out of the front door of his residence and sit on his porch to put on his work boots. Defendant got in the white Dodge truck.

---

[1] The UPAX database now lists the defendant's June 20, 2025 immigration encounter and subsequent actions.

The truck was pulling a large work trailer. DO Hernandez observed that the defendant matched his picture on his Honduran Identification card. When DO Hernandez positively identified the defendant, he called out over the radio to the rest of the team that he had identified the defendant. This prompted HSI SA Carl to pull in behind the defendant's white Dodge truck and activate his emergency lights. DO Hernandez was behind HSI SA Carl also with his emergency lights flashing. Both vehicles, while unmarked, had their blue and red lights flashing. Defendant pulled over on Consuela Street. DO Hernandez was wearing a green bullet proof vest with a patch saying "POLICE" across his chest, and a police badge displayed on the top of his chest. Also affixed to the front of his vest was a handheld radio, flashlight, handcuff key, and handcuffs in a pouch. SA Carl was wearing a duty belt displaying his badge.

DO Hernandez will testify that he approached the defendant's driver's side window and identified himself as law enforcement. DO Hernandez asked defendant to roll down his window and asked for his ID. The truck was still on. Right away, the defendant got on his cell phone to an unknown person. DO Hernandez asked him to roll down his window and turn off the truck. SA Carl also gave commands to roll down his window. Defendant ignored DO Hernandez. DO Hernandez said "Jaime, show me your ID." Defendant showed DO Hernandez his ID through the window. DO Hernandez will testify it was a Honduran Identification card, and it displayed the defendant's name, date of birth and nationality, confirming he was the target. DO Hernandez continued commands for the defendant to roll down the window. DO Hernandez will testify that the truck doors were locked. The video will show SA Carl checking the doors on both sides of the truck, and they were locked. Commands were given in both English and Spanish. DO Hernandez told the defendant if he doesn't roll down the window his window would be breached. During this initial encounter, SA Carl was standing at the passenger side window.

DO Hernandez will testify that he and the other agents considered this area to be a high-risk area. Specifically, DO Hernandez will testify that this area off Culebra Road, on the west side of San Antonio, is not an immigration enforcement friendly area. ERO runs many enforcement operations in that area. And they observed people across the street filming them. DO Hernandez heard someone yelling during the encounter. It was also significant that the vehicle stop was near the defendant's residence. The totality of this, coupled with the defendant's communication on his cell phone to an unknown person, caused agents to be concerned for officer safety. As a result, DO Hernandez will testify that he and SA Carl decided to break the window.

Two DPS agents wore body-cameras. One of the videos will show the defendant drove away. The video will show the defendant steering his truck around a parked car on the street Simultaneously with the defendant driving away, SA Carl breached the lower corner of the driver's side window. As the defendant evaded in his vehicle, SA Carl's arm was scraped, torn, and punctured on the broken glass causing bodily injury. DO Hernandez will testify that the DPS Agents pulled their vehicles in front of the defendant, blocking his escape. At that point, the defendant reversed his truck, and drove backwards, ultimately crashing into HSI SA Carl's vehicle parked behind him.

DO Hernandez will testify once the defendant was blocked in by law enforcement vehicles, agents pulled out the remaining driver's side window and reached in to unlock the defendant's door. The defendant still refused to exit his truck by holding onto the steering wheel. DO Hernandez will describe that he had to enter the vehicle to remove the defendant.  Defendant resisted the entire time.

Once he was outside of the vehicle, the defendant continued to resist by locking his arms under his body to prevent being handcuffed. Multiple agents were required to get the defendant's

wrist behind him. Again, the defendant resisted until he was handcuffed. DO Hernandez will testify that once the defendant was detained, he allowed the defendant to make a call to a friend to pick up his dog.

<u>Argument</u>

In his motion, the defendant is asking the Court to dismiss the indictment in this cause, or alternatively suppress evidence, based on law enforcement's unjustified vehicle stop, expanded scope of the stop, and outrageous law enforcement conduct. However, law enforcement in this case were authorized under the law to make the vehicle stop and arrest the defendant. Any escalation was a direct result of the defendant forcibly resisting, opposing, impeding, intimidating, and interfering with lawful law enforcement operations. This motion should be denied.

**A.      Authority to Arrest and Justified Seizure**

The powers of immigration officers and employees are codified in 8 U.S.C. §1357. Specifically:

> (a) Powers without warrant. Any officer or employee of the [Immigration and Naturalization] Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
> (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
> (2) ….to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.
> 8 U.S.C. §1357(a)(1) & (2)

Section 1357 and the Fourth Amendment do not sanction random detention; rather, detention of an individual must be based on an officer's reasonable suspicion that the particular individual is engaged in criminal activity—in this case, is an alien illegally in the country—and the detention is solely for the purpose of inquiring further as to that alien's status. *Mendoza v.*

*I.N.S.*, 559 F. Supp. 842, 848 (W.D. Tex. 1982). *See Martinez-Fuerte*, 428 U.S. at 560–61, 96 S.Ct. at 3084; *Terry v. Ohio*, 392 U.S. at 21, n. 18, 88 S.Ct. at 1880, n. 18; *Babula*, 665 F.2d at 297; *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

These provisions, however, must be construed to be consistent with the requirements of the Fourth Amendment, for Congress cannot statutorily create exceptions to Constitutional Amendments. *Almeida-Sanchez v. U.S.*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); See *Limon v. United States*, 2023 WL 3922653 *5 (S.D. Texas- Laredo, 2023).

Longstanding precedent establishes that "[t]he Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (citing Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

In *Brignoni–Ponce*, the Supreme Court applied this well-established principle to determine what standard of proof, if any, an immigration officer must apply to stop and detain individuals to investigate their immigration status. *See* 422 U.S. at 880–82, 95 S.Ct. 2574. In that case, the government argued that, within 100 miles of the border, it had "authority to stop moving vehicles and question the occupants about their citizenship, even when its officers have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle." *Id.* at 877, 95 S.Ct. 2574. The Supreme Court rejected the government's argument. The Court stated that, just as in the criminal context, an immigration officer "must have a reasonable suspicion" to justify briefly stopping individuals to question them "about their citizenship and immigration status ... but any

further detention ... must be based on ... probable cause." *Id.* at 881–82, 95 S.Ct. 2574 (emphasis added) (*citing Terry*, 392 U.S. at 29, 88 S.Ct. 1868).

Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. *Id.* at 884.

The stopping of a vehicle and detention of its occupants constitutes a "seizure" under the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, are treated as *Terry* stops. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam); *see e.g., United States v. Dortch*, 199 F.3d 193, 198 (5th Cir.1999).

Pursuant to *Terry*, the legality of police investigatory stops is tested in two parts. *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968); *Brigham*, 382 F.3d at 506. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Terry*, 392 U.S. at 19–20.

In this case, DO Hernandez and SA Carl had specific, articulable evidence that this specific defendant was illegally present in the United States. While the defendant was initially identified based on an HSI tip containing his name, date of birth, cell phone, and residence, the defendant was targeted based on further investigation which corroborated the tip. As well, the tip contained a picture of the defendant's foreign-born Honduran Identification card, on which it states he was born in Honduras. HSI Alpine did research to confirm the tip. Then DO Hernandez conducted his own research to confirm the tip, to include speaking to the female who made the tip. According to

databases DO Hernandez and other law enforcement rely upon, the defendant did not have any lawful status to be in the United States. DO Hernandez also learned the defendant had two vehicles registered in his name. DO Hernandez and Texas DPS conducted surveillance over several days of the defendant's residence on Benrus Blvd. and observed the two vehicles registered to the defendant. All of this established probable cause to detain and interrogate the defendant.

Once the agents activated their emergency lights, the defendant pulled over and activated his hazard lights. When DO Hernandez approached the driver's side window, he identified himself as law enforcement and asked the defendant to roll down his window and to show ID. While the defendant refused the commands to roll down his window, he did display a Honduran Identification card. DO Hernandez observed the defendant's picture and date of birth, confirming this was the correct target. After repeated commands by both DO Hernandez and SA Carl to roll down his window, the defendant failed to comply. And the defendant was already communicating with an unknown person.  This presented a concern for officer safety considering the high-risk area they were in and the people outside.

The defendant Could have just rolled down his window. But he didn't. He continued to forcibly resist, oppose, impede, intimidate, and interfere with lawful law enforcement operations. Based on the defendant's choice to not cooperate, law enforcement was required to take steps to secure the defendant.

In finding police officers had qualified immunity in a §1983 claim, the Fifth Circuit in *Rucker v. Marshall*, ruled "[w]e have repeatedly held that noncompliance or continued physical resistance justifies the use of force." 119 F.4th 395, 403 (5th Cir. 2024). The defendant in *Marshall*, like the defendant in this case, refused multiple orders from law enforcement resulting in the window being breached to gain custody of the defendant. But unlike the defendant in *Marshall*,

the defendant in this case continued to resist and impede officers requiring agents to physically remove him from the vehicle. And then, once removed, the defendant in this case continued to resist all attempts to handcuff him. And then, once officers had the defendant's wrists, he continued to resist. Once the defendant was cuffed, like the defendant in *Marshall*, the officers ceased all use of force. See, e.g., *Solis v. Serrett*, 31 F.4th 975, 979 (5th Cir. 2022) (no excessive force when, during a minor traffic stop, officers grabbed a belligerent passenger's arms, took her to the ground, cuffed her, and then raised her up); *Priest v. Grazier*, 860 F. App'x 343, 344–45 (5th Cir. 2021) (granting qualified immunity to officers who, after spending two minutes trying to get the plaintiff to lower his window or open his door, broke the window, took him to the pavement, held his face down in broken glass while cuffing him, and struck him three times to get him to stop pulling his hand away); *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009) (no excessive force during minor traffic stop because suspect's resistance to being handcuffed justified "pushing him onto the hood of the cruiser"); *Tennyson v. Villarreal*, 801 F. App'x 295, 296 (5th Cir. 2020) (granting qualified immunity to officers who "had to take [plaintiff] to the ground to handcuff him because of his noncompliance").

The defendant compares his situation to the one in *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009), where the Fifth Circuit held that a reasonable jury could find that the degree of force was unjustified in this case. However, the cases are not at all similar. While both defendants resisted law enforcement commands repeatedly, the similarities stop there. Plaintiff-Appellant Deville was pulled over for speeding, not a violation of federal law. While the 45-year old female with a child in the car did not pose a threat, law enforcement in this case reasonably believed there was an officer safety situation with the area of town they were in, and the fact that the defendant was on the phone and his continued non-compliance. Deville told officers she was calling to have

the child picked up. Conversely, law enforcement did not know who the defendant was calling. While there is later hearsay testimony that the defendant in this case was calling to have his dog picked up, officers did not know that at the scene.

As the DPS body-camera video reveals, almost simultaneously with the window breach, the defendant drove away, evading with a very large motor vehicle pulling a very large trailer. If Texas DPS had not been positioned ahead, defendant would have fled the scene. This distinguishes the case at hand from *Deville*.

Law enforcement had probable cause to conduct an investigatory stop of the defendant, and arrest him once his identify was confirmed.

### B. Law Enforcement did not use Excessive Force.

Defendant next argues that even if agents had a valid basis to stop him, the intensity of the seizure was unjustified. Excessive force analysis requires determining whether an alleged injury resulting from force was "excessive to the need" and that "the force was objectively unreasonable." *Hankins v. Wheeler*, 109 F.4th 839, 852 (5th Cir. 2024) (citing *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (citations omitted). These inquires "collapse into a single objective-reasonableness inquiry," *Id*. (citing *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2019), in which courts "examine the totality of the circumstances to determine whether an officer's actions were objectively unreasonable." *Roque v Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (internal quotation marks and citation omitted). These circumstances include the "severity of the crime," "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Darden v. City of Fort Worth*, 880 F.3d 722, 728–29 (5th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

In addressing an excessive force claim brought under §1983, the Supreme Court ruled:

"Today we make explicit what was implicit in *Garner*'s analysis, and hold that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989).

Determining whether the force used to affect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. *Id.* at 396. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Id. See Terry v. Ohio*, 392 U.S., at 22–27, 88 S.Ct., at 1880–1883. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *quoting Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id. See Tennessee v. Garner*, 471 U.S., at 8–9, 105 S.Ct., at 1699–1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

So, the question is whether the force deployed was justified from "the perspective of a reasonable officer on the scene," taking due account of both the individual interests and the governmental interests at stake. *Barnes v. Felix,* 145 S. Ct. 1353, 1358, 221 L. Ed. 2d 751 (2025); *Graham*, 490 U.S., at 396, 109 S.Ct. 1865; *County of Los Angeles v. Mendez*, 581 U.S. 420, 428,

137 S.Ct. 1539, 198 L.Ed.2d 52 (2017). That inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances. *Id.* For example, the "severity of the crime" prompting the stop can carry weight in the analysis. *Id.* So too can actions the officer took during the stop, such as giving warnings or otherwise trying to control the encounter. *Id.* And the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others. *Id.* [I]t is hornbook law that "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Buehler v. Dear*, 27 F.4th 969, 980–81 (5th Cir. 2022). *See Graham*, 490 U.S. at 396; *see also Fulton v. Staats*, 41 N.Y. 498, 499 (1869) (Officers may "use as much force as [i]s necessary to make the arrest.").

We must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts. *Id*. at 984. *See Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016). The defendant in Griggs was arrested for DWI, and resisted arrest requiring law enforcement to take him to the ground where he continued to resist. Officers punched the defendant in response to his assault on them, as well as his continued resistance. In holding the officers were entitled to qualified immunity, the *Griggs* Court articulated the "[f]actors to consider in determining whether the force was "objectively reasonable" include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Griggs* at 312 (5th Cir. 2016).

All force used by law enforcement in this case was objectively reasonable. The defendant was being arrested for being illegally in the United States. This is a violation of federal law. The defendant posed a threat to the safety of the officers due to his continued non-compliance in a

high-risk area coupled with him immediately calling an unknown person on the phone as law enforcement was attempting to detain him. And lastly, the defendant actively resisted and evaded arrest by ignoring commands and keeping his truck doors locked. The force used to arrest the Defendant was not excessive, instead it was measured, and only elevated because of the defendant's intentional choice to forcibly resist, oppose, impede, intimidate, and interfere with lawful law enforcement operations. Such actions ultimately causing bodily injury to SA Carl.

### C. Law Enforcement Actions were Justified.

Lastly, the defendant argues the agents engaged in conscience-shocking and outrageous conduct. Law Enforcement conduct was not shocking nor outrageous. The standard for proving outrageous governmental conduct is extremely demanding. *United States v. Vasquez-Hernandez*, 924 F.3d 164, 170 (5th Cir. 2019) (quoting *United States v. Sandlin*, 589 F.3d 749, 758 (5th Cir. 2009)).

"Government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." *United States v. Sandlin*, 589 F.3d 749, 758–59 (5th Cir. 2009) (internal quotation marks and citation omitted). *See also United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009) (holding that government's conduct was not so "shocking to the universal sense of justice" that the government should be deprived of the opportunity to prosecute the defendant).

Outrageous government conduct will only be found in the "rarest" of circumstances. *Id*. For instance, the Fifth Circuit has, "declined to find outrageous conduct where the Government failed to disclose the defendant's signature on a particular document was forged; engaged in entrapment; or abducted the defendant from his home country to circumvent extradition proceedings." *Id*. (emphasis added) (quoting *Sandlin*, 589 F.3d at 759). Courts have rejected

litigants' claims that various governmental acts shock the conscience with almost monotonous regularity, leading the Fifth Circuit to remark that "the viability of the doctrine is hanging by a thread." *Id*. (quoting *United States v. Nolan-Cooper*, 155 F.3d 221, 229-30 (3d Cir. 1998)).

In this case, law enforcement tactics did not shock the conscience. The defendant is illegally present in the United States, in violation of federal law. This is distinguishable from the defendant in *Deville* who committed a traffic offense. The vehicle stop was in a high-risk area, with neighbors outside filming. After multiple agents gave the defendant in this case commands in Spanish and English to roll down the window, he continued to refuse. Also, he immediately got on his cell phone to an unknown person. This was of heightened concern considering he lives so close to the vehicle stop. Law Enforcement can and did reasonably fear he was calling for other people to come to the scene, which would pose a greater officer safety risk.

If the defendant would have just rolled down his window; if the defendant would have just gotten out of the truck; if he would have just complied, the window would not have had to be broken. If the defendant hadn't resisted, opposed, impeded, intimidated, and interfered with the lawful duties of federal agents, a federal agent would not have been injured.

WHEREFORE this Motion to Dismiss and Suppress should be DENIED.

Respectfully submitted,

JUSTIN R. SIMMONS
UNITED STATES ATTORNEY

*/s/*
_____
Sarah Wannarka
Assistant United States Attorney
Texas Bar 24013710
601 NW Loop 410
San Antonio, TX 78216
210.384.7100/ fax 210.384.7118

<u>CERTIFICATE OF</u>
<u>SERVICE</u>

I hereby certify that on the August 18, 2025, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/EF System and thereby served on the attorney of record.

*/s/*_____

Sarah Wannarka
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | **5:25-CR-388-XR** |
| v. | § | |
| | § | |
| **JAIME ALBERTO QUINTANILLA-CHAVEZ,** | § | |
| | § | |
| Defendant. | | |

## <u>ORDER</u>

Having considered the record, the Defendant's Motion to Suppress and Dismiss for Constitutional Violations (Doc. 38), and the Government's Response,

IT IS HEREBY ORDERED that the Defendant's motion is DENIED.

SIGNED AND ENTERED this_____, 2025.

_____
HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE