### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | SA-25-CR-388-XR |
| -vs- | § | |
| | § | |
| JAIME ALBERTO QUINTANILLA-CHAVEZ, | § | |
| *Defendant* | § | |

## ORDER DISMISSING INDICTMENT

The Government has charged the Defendant Jaime Alberto Quintanilla-Chavez with "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with [a federal officer] engaged in . . . the performance of official duties" in violation of 18 U.S.C. § 111(a)(1). The Government seeks an enhanced penalty of up to twenty years in prison under § 111(b) for "inflict[ing] bodily injury" on Homeland Security Investigations (HSI) Special Agent (SA) William Carl, who scraped his arm when he punched a hole in the Defendant's driver-side window during an investigative stop.

The Defendant asks the Court to dismiss the indictment for failure to state an offense, arguing that he did not act "forcibly," did not personally "inflict" SA Carl's injuries, and did not act with the requisite state of mind. ECF No. 37. He also asks the Court to suppress all evidence and dismiss the charges against him based on violations of his constitutional rights under the Fourth Amendment and Fifth Amendment. ECF No. 38. The Court heard arguments on both motions on August 25, 2025. *See* ECF No. 60, 8/25 Hr'g Tr.

For the reasons stated herein, both motions (ECF Nos. 37, 38) are **GRANTED** and all charges against the Defendant are **DISMISSED**.

## BACKGROUND

**Investigation into Defendant's Immigration Status**

On June 14, 2025, HSI Agent Noel Vidal emailed Immigration and Customs Enforcement (ICE) Deportation Officer (DO) Hector Hernandez about "an easy target for weekend operations."[1]

Two days earlier, HSI had received a tip from Yolanda Torres-Molinar, a resident of Alpine, Texas (approximately 380 miles from San Antonio), that the Defendant was illegally present in the United States and living in San Antonio, Texas. Ms. Torres-Molinar alleged that the Defendant had physically abused her daughter and was stalking her. She provided the Defendant's full name, date of birth, phone number, and address (114 Benrus Blvd, San Antonio, Texas) and alleged that his brother, Franklin, was also residing at the Benrus house illegally. The tip included a picture of vehicles allegedly belonging to the Defendant and his brother and a picture of an identification card bearing the Defendant's photo, name, and date of birth and indicating (in English) that he was "Honduran by: Birth." 8/25 Hr'g, GEX 3, 4.

Hernandez claims that while investigating the tip between June 14 and June 19, he:

(1) reviewed the photo on the Honduran identification card;

(2) reviewed a database called "UPAX," which allows a user to scan information from several governmental agencies and get a consolidated view of data about a person;[2]

(3) conducted a Person Centric Query, which provides transactions involving an immigrant or nonimmigrant across multiple DHS and external systems;[3]

(4) spoke on the telephone with Ms. Torres-Molinar; and

(5) conducted surveillance on the Benrus house and verified that the vehicles that Ms. Torres-Molinar had provided in her tip were present at the home.

*See* ECF No. 60, 8/25 Hr'g Tr. at 4–13, 45.

---

[1] 7/10 Hr'g, Government's Exhibit (GEX) 1; 8/25 Hr'g, GEX 4.
[2] Privacy Impact Assessment Update for the Automated Targeting System, DHS/CBP/PIA-006(e), U.S. Dep't of Homeland Sec. (Jan. 13, 2017), https://perma.cc/T2GT-FZQT.
[3] DHS/USCIS/PIA-010 Person Centric Query Service, U.S. Dep't of Homeland Sec. (last updated Mar. 31, 2023), https://perma.cc/PM6E-ZMSL.

Officer Hernandez did not document any of these alleged attempts to corroborate the information in Ms. Torres-Molinar's tip. He testified that he did not print copies of the database queries for Defendant's name because they did not yield any results whatsoever, let alone results that would shed light on the Defendant's immigration status (e.g., an application for asylum or an order of removal). *Id.* at 68:7–25. Although he further testified that he contacted Ms. Torres-Molinar before the operation "to see if she had any additional information and to confirm the address," he could not specify the date or time of the alleged phone call. *Id.* at 13:1–2, 12–14.

Based on his investigation, Hernandez concluded that Defendant was an illegal alien but later said, "you can never be 100% sure." *Id.* at 64:11. Still, he did not seek an administrative warrant because he did not think a DHS officer would sign one without a notice of removal. *Id.* at 66:18–20.

**The Warrantless Arrest**

At about 6:00 a.m. on June 20, 2025, ICE Officer Hernandez led a team of three officers from the Criminal Investigations Division of the Texas Department of Public Safety (TX-DPS) and HSI Special Agent Carl to the Benrus house. *Id.* at 4–5, 17–18. SA Carl testified that he believed he and the others were there to execute an arrest warrant and assumed, based on his previous experiences with ICE operations, that the Defendant was subject to a final order of removal. *Id.* at 85:3–10. DO Hernandez, for his part, never informed the team about the results of his investigation into the Defendant's immigration status (i.e., that there was no evidence of removability).

At some point between 7:15 a.m. and 7:30 a.m., the Defendant exited the Benrus home, put on work boots, and drove away in a white Dodge Ram pulling a trailer filled with equipment. ECF No. 1 ¶ 2. Hernandez positively identified the Defendant based on his identification photo

and called out to the other officers on the radio. Carl briefly followed the Defendant in his unmarked vehicle before activating his emergency lights. *Id.*; ECF No. 60, 8/25 Hr'g Tr. at 20:22–21:12. DO Hernandez, traveling behind SA Carl in his own unmarked vehicle, activated his lights. The Defendant pulled over, came to a stop, and took out his cell phone to call a friend to come pick up the only other occupant of his vehicle: his weenie dog, Rocky. ECF No. 29, 7/10 Hr'g Tr. at 29:9–18. The Defendant's friend saw from his video messaging application that there were men aiming guns at the Defendant and yelling at him. *See id.* at 25:17–21.

SA Carl, in plain clothes, exited his vehicle and approached the passenger side of the Dodge Ram. ECF No. 60, 8/25 Hr'g Tr. at 76:13–15. DO Hernandez, wearing a police badge and bullet proof vest with a "POLICE" patch across the chest, approached the driver's side. *Id.* at 22:11–13. Carl testified that he heard Hernandez yelling in both Spanish and English at the Defendant, asking for his name and directing him to roll down the window and turn off the truck. *Id.* at 76:18–22. Hernandez testified that the Defendant did not respond to his commands and instead began to use his phone. *Id*. at 23:12–13. At some point, Hernandez asked him for identification, and the Defendant held his Honduran ID card up to the window. *Id*. at 24. Hernandez testified that, while the ID card matched the person he was looking for, he did not ask the Defendant any immigration related questions. *Id.* at 25:4–6, 61:12–21. Instead, he warned that if the Defendant did not roll down the window, the officers would breach it. *Id.* at 25:14–15. SA Carl testified that he tried to open the doors of the truck; DO Hernandez could not recall whether he made any similar attempts. *See id.* at 25:9–11; 76:25–77:1. No search warrant or arrest warrant had been secured.

Events escalated quickly after the Defendant failed to roll down his window or exit the vehicle. Body camera footage from a TX-DPS officer shows DO Hernandez and SA Carl calmly giving instructions to the Defendant in Spanish and attempting to open the doors to his truck. *See*

8/25 Hr'g, GEX 1 at 00:52. In less than a minute, SA Carl tells the TX-DPS officer, "Stand here. I'm going to go get my window break; I ain't got time for this." *See id.* at 01:38–40. SA Carl walked to his vehicle, retrieved his window break, returned to the driver's side of the Defendant's vehicle, and stood next to the back door as he put on protective gloves. *See id.* at 01:40–2:20. He approached the back door and tried to open it. *See id.* at 2:20–24. When that failed, he moved to the front door. In the next second, the Defendant's vehicle (and trailer) moved forward, and SA Carl broke the driver-side window of the vehicle. *See id.* at 2:25.

SA Carl ran behind the trailer until, about four seconds later, the Defendant's path was blocked by TX-DPS vehicles approximately two car lengths away. *See id.* at 2:26–30. The Defendant then reversed and slowly backed away from them, stopping when his trailer allegedly hit another agent's vehicle behind him. It is unclear from the body camera footage whether there was actually any contact.[4] *See id.* at 2:38–48.

Once the Defendant had stopped and was blocked in on both sides, a TX-DPS officer raised his firearm at the Defendant while SA Carl removed the broken glass from the window, opened the vehicle door, and the team forcibly extracted the Defendant from the vehicle. *Id.* at 3:00–32. Multiple agents forced the Defendant to the ground and handcuffed him. *Id.* Bleeding from the head and painfully handcuffed, the Defendant attempted to speak to officers in his native Spanish, but SA Carl told him to "Shut your f_____ mouth. Shut your mouth." *See* 8/25 Hr'g, GEX 2 at 03:11. Only then did Hernandez ask the Defendant questions regarding his immigration status. *See* ECF No. 60, 8/25 Hr'g Tr. at 61.

---

[4] While the Government's sworn affidavit and briefing make much of this alleged collision, it appears from the video that, at some point—either as the Defendant was backing up or as the officers were pulling him out of the truck—the trailer nudged the front bumper of Carl's vehicle, parked just behind, causing minor damage. *See* 8/25 Hr'g, GEX 1 at 02:50. In any event, the Government has confirmed that it is not pursuing a charge on that basis. *See* ECF No. 29, 7/10 Hr'g Tr. at 12:1–9.; ECF No. 60, 8/25 Hr'g Tr. at 81:18–24.

**Procedural History**

The Government has presented inconsistent positions about the basis for the initial stop, for the arrest, and for the charges against the Defendant.

The sworn affidavit submitted in support of the Criminal Complaint in this matter tells a very different—and largely fictional—story. For example, Special Agent Steven Fuentes of ICE, HSI, and the Department of Homeland Security (DHS) swore to the following:

> On June 20, 2025, [HSI, ICE-ERO, and TxDPS] were conducting surveillance at a residence on Benrus, in San Antonio, Texas, in the Western District of Texas. **Database checks indicated that Jaime Albert QUINTANILLA-Chavez, with a Final Order of Removal from an Immigration Judge, was residing at the above address**. At approximately 0715 a.m., QUINTANILLA exited the residence and entered a white Dodge Ram. The Dodge Ram was towing a trailer containing construction equipment. **Both license plates for the truck and trailer were expired.**

ECF No. 1 ¶ 2 (emphasis added). Fuentes also swore that (1) the Defendant refused to "follow any commands"; (2) after the Defendant was blocked in between the officers' vehicles, he was given "multiple verbal commands to exit the vehicle"; and (3) the Defendant "fought the law enforcement officers." *Id.* ¶¶ 3–4. Fuentes further testified at the preliminary hearing that the Defendant was surveilled (and taken into custody) because he was subject to a Final Order of Removal from an Immigration Judge. *See* ECF No. 12, 6/26 Preliminary Hr'g Tr. at 4:20–25.

Despite HSI's sworn statement to the Magistrate Judge that the vehicle was stopped because of expired license plates, the Assistant U.S. Attorney conceded at a bond hearing in July 2025 that Fuentes had "misrepresented what was going on." ECF No. 29, 7/10 Hr'g Tr. at 8:12–13. The stop was not made because of expired license plates—or even the domestic violence allegations, which were never investigated—but solely based on a tip about the Defendant's immigration status. *Id.* at 7:24–8:2.

At the bond hearing, the Government characterized the stop as a "probable cause" stop because of a suspected immigration violation.[5] *Id.* at 7:16–17, 8:14–18. The story changed yet again at the hearing on the instant motions, when DO Hernandez himself acknowledged that he did not seek a warrant for the Defendant's arrest precisely because he did not think, based on his investigation, he had enough information to establish that the Defendant was removable. ECF No. 60, 8/25 Hr'g Tr. at 66:2–23. SA Carl, on the other hand, *assumed* that he was executing an arrest warrant and that the Defendant was subject to an order of removal. *See id.* at 83:11–84:5; 85:1–10; 89:18–21. He then reported that false information to Agent Fuentes, who included it in his affidavit. *See id.* at 83:11–84:5. DO Hernandez never disabused the team of any notion that there was an order of removal.

The inconsistencies do not end there. The Government's briefing and the officers' testimony suggest that the officers at the scene feared for their safety because they considered it a location that was not "an immigration enforcement friendly area," ECF No. 46 at 5, that they observed people filming them from across the street and heard someone yelling during the encounter, and because the Defendant made a call to an unknown person on his cell phone during the stop. *See, e.g.*, *id.* The video footage does not show anyone else at the scene other than the Defendant and the officers, let alone people filming, yelling, or otherwise causing a disturbance.

Nor does the demeanor of any of the officers suggest that they were concerned about their safety. Indeed, as to the location, the team made the unilateral decision to stop the vehicle at that location rather than, say, follow the Defendant and stop him at a "friendlier" area on his way to work. *See, e.g.*, 8/25 Hr'g, GEX 1 at 1:40–2:24 (SA Carl slowly and calmly proceeding to his car

---

[5] The Government has waived the ability to invoke expired plates or unspecified allegations of domestic violence as a basis for the seizure. *See* ECF No. 29, 7/10 Hr'g Tr. at 8 (asserting that the stop was based on the Defendant's suspected immigration status); *id.* at 6 ("I don't know anything about the allegations of domestic violence[.]").

to retrieve his window break and putting on his gloves); ECF No. 60, 8/25 Hr'g Tr. at 78:18–19

(SA Carl's testimony that he "took [his] time putting on [his] gloves" before breaking the window

because he wanted to give the driver time to respond). Similarly, while the Government was very

concerned about the danger presented by the Defendant's truck, ECF No. 60, 8/25 Hr'g Tr. at

100:21–24, the officers at the scene decided to wait until he was in his truck to conduct the *Terry*

stop, instead of stopping the Defendant—standing five-foot-five and 128 pounds, *id.* at 35:10–

16—as he emerged from his home unarmed and, presumably, carrying a wiener dog. Based on

these factors, the Court ruled on the record that it found any arguments or testimony concerning

officer safety not credible. *Id.* at 100:13–14.

    With these inconsistencies in mind, the Court proceeds to the Defendant's arguments that

the Court should dismiss the indictment against him for failure to state an offense and because both

his initial stop and his arrest were unconstitutional. *See* ECF Nos. 37, 48.

**DISCUSSION**

## I.    Motion to Dismiss for Failure to State an Offense (ECF No. 37)

    The Defendant moves to dismiss the indictment for failure to state an offense under 18

U.S.C. § 111, arguing that (1) he did not "forcibly" oppose, resist, or interfere with SA Carl's duties

by moving his vehicle forward; (2) SA Carl's injuries were self-inflicted; (3) the Government

cannot prove that he engaged in intentional conduct when his vehicle moved forward; and (4) the

Government cannot show that Defendant knew SA Carl was a federal officer.

### A.    Legal Standard

    Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial

motion any defense, objection, or request that the court can determine without a trial on the merits."

If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12

authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* FED. R. CRIM. P. 12(d) (permitting the court to rule on a motion involving factual issues provided the court states its essential findings on the record).

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) specifically allows pretrial challenges to counts that "fail[] to state an offense." In ruling on such a challenge, the Court may assume the truth of the government's allegations. *See United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011); *see also United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994) ("a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt.").

### B.    Analysis

The Defendant is charged with violating 18 U.S.C. § 111(a) and (b). Subsection (a) makes it a crime to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with any" "officer or employee of the United States or of any agency in any branch of the United States Government" "while engaged in or on account of the performance of official duties." 18 U.S.C. §§ 111(a), 1114. Subsection (b) provides an enhanced penalty for, among other things, "inflict[ing] bodily injury." *Id.* § 111(b).

The Fifth Circuit has interpreted § 111 to create three separate offenses: "(1) simple assault; (2) more serious assaults but not involving a dangerous weapon; and (3) assault with a dangerous weapon." *United States v. Williams*, 520 F.3d 414, 420 (5th Cir. 2010) (quotation omitted). The first offense is a misdemeanor, which courts commonly call "simple assault." *United States v. Hernandez-Hernandez*, 817 F.3d 207, 212–23 (5th Cir. 2016). Such "simple assault" would be an "attempted or threatened battery"—i.e. without physical contact. *United States v. Williams*, 602 F.3d 313, 316 (5th Cir. 2010). The less serious felony occurs either (1) when there is a completed

battery, i.e., when there is "any physical contact," or (2) when the act is committed with the intent to commit another felony. *Hernandez-Hernandez*, 817 F.3d at 212–13. The more serious felony—charged here—occurs when, "in the commission of any [of the prohibited] acts," the defendant "uses a deadly or dangerous weapon . . . or inflicts bodily injury." 18 U.S.C. § 111(b); *Hernandez-Hernandez*, 817 F.3d at 213.

The Government has charged the Defendant under § 111(a)(1) and (b) for forcibly resisting, opposing, impeding, intimidating, and interfering with SA Carl while he was engaged in the performance of official duties and inflicting bodily injury on him. ECF No. 16. The Government has elected not to charge the Defendant with forcible assault and seeks an enhancement only for SA Carl's bodily injury, not for the use of a deadly or dangerous weapon. *See* ECF No. 29, 7/10 Hr'g Tr. at 11–12.

In support of these charges, the Government alleges that: (1) SA Carl was attempting to breach the Defendant's vehicle window based on officer safety and because the Defendant refused to obey lawful orders; (2) as SA Carl was about to breach the window, the Defendant moved his truck; (3) SA Carl breached the window and his arm was caught on the broken window glass causing bodily injury as the Defendant drove away; and (4) SA Carl was injured as his skin was scraped, torn, and punctured by the broken window glass. ECF No. 47 at 1–2.

### 1.  Defendant did not "forcibly" resist, oppose, or interfere with SA Carl

The Defendant first asserts that the Government cannot state an offense under § 111(a) because he did not "forcibly" assault, resist, oppose, impede, intimidate, or interfere with the officers within the meaning of the statute. ECF No. 37 at 2–6. The Court agrees.

To prove the base § 111(a) offense, the Government must show that the defendant acted "forcibly." "The term 'forcibly' modifies *all* of the acts rendered unlawful by § 111(a)(1)"—not

just "assault." *United States v. Hazlewood*, 526 F.3d 862, 865 (5th Cir. 2008) (citing *United States v. Arrington,* 309 F.3d 40, 44 (D.C. Cir. 2002) ("a defendant does not violate [§ 111(a)] unless he *forcibly* assaults or *forcibly* resists or *forcibly* opposes" (emphasis in original)). Thus, "'force' is a necessary element of any § 111 violation." *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir. 1993) (cited approvingly in *Williams*, 602 F.3d at 317).[6]

"[W]hile the defendant must do more than merely refuse to cooperate with the federal agent, '[w]hether a person has opposed the efforts of federal agents with *sufficient force* . . . can . . . be a troublesome question of degree." *Sophin v. United States*, 153 F. Supp. 3d 956, 963–64 (W.D. Tex. 2015) (quoting *United States v. Cunningham*, 509 F.2d 961, 963 (D.C. Cir. 1975) (emphasis added)).

"At one end of the spectrum, refusal, without more, to cooperate or comply with a federal agent's orders is insufficient to uphold a conviction for forcible resistance under § 111(a)(1)." *Id.* at 963 (citing *United States v. Hightower*, 512 F.2d 60, 61 (5th Cir. 1975) (reversing conviction for forcible resistance where defendant refused to provide his gun as evidence to the agent and "expressed unwillingness to go to the local law enforcement office," because no evidence showed that the co-defendant "at any time used force *against* the agent" (emphasis added)).

"At the opposite end of the spectrum, the Fifth Circuit has found sufficient evidence of forcible conduct where the defendant acted *toward the federal agent* in a forceful manner, for the purpose of resisting, opposing, impeding, intimidating, or interfering with the agent." *Id.* at 964 (emphasis added). For example, the Fifth Circuit upheld a conviction for forcible resistance when an arrestee struck two officers as she swung her arms and pulled away from them in a struggle to

---

[6] *United States v. Bamberger*, 452 F.2d 696, 699 (2d Cir. 1971) ("[I]t is a general rule of statutory construction that words in statutes should not be construed as excess verbiage . . . . The word 'forcibly' in section 111 ought to limit the proscribed acts to fewer than would fit the definition of the unmodified verbs alone." (citing Sutherland, Statutory Construction ¶ 4705 (3d ed. 1943))).

avoid being handcuffed. *United States v. Williams*, 602 F.3d 313, 314 (5th Cir. 2010). Although the officers testified that she did not intentionally hit them, the defendant admitted that she swung her arms for the specific purpose of resisting the officers' attempts to handcuff her. *Id.*

Thus, a defendant need not *intentionally* assault an officer to face liability under § 111(a). Still, to have any meaning at all, the force in question must be directed *toward* or *against* an officer.[7] *See, e.g.*, *Forcible*, Black's Law Dictionary (10th ed. 2014) (defining "forcible" as "effected by force or threat of force *against* opposition or resistance," and "force" as "[p]ower, violence, or pressure directed *against* a person or thing." (emphasis added)). Otherwise, anyone who opposes arrest by merely backing away from an officer with his hands up would violate § 111(a) based on the "force" of stepping away.

"Several circuits have adopted a definition of 'force' in the context of § 111," to include "such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *Sophin*, 153 F. Supp. 3d at 966 (collecting cases).[8] The Eighth Circuit has held that "the defendant's behavior [must] reasonably have inspired fear in a reasonable person." *See United States v. Street*, 66 F.3d 969, 977 (8th Cir. 1995) (cleaned up). Applying this definition, at least one judge in the Western District of Texas has overturned a jury conviction under § 111(a), concluding that merely "pull[ing] away" from a traffic stop is not "forcible" conduct within the meaning of the statute. *See Sophin*, 153 F. Supp. 3d at 966–68.

---

[7] *See, e.g.*, *United States v. Ramirez*, 233 F.3d 318, 322 (5th Cir. 2000) (hurling urine-feces mixture onto officer was an assault on a federal officer); *Hightower*, 512 F.2d at 61 (grabbing a federal wildlife agent's jacket); *United States v. Fernandez*, 837 F.2d 1031, 1035 (11th Cir. 1988) (bumping assistant United States Attorney while repeatedly advising the attorney to "watch his back"); *United States v. Frizzi*, 491 F.2d 1231, 1232 (1st Cir. 1974) (spitting in the face of a mail carrier); *United States v. Hernandez*, 921 F.2d 1569, 1576 (11th Cir. 1991) (poking IRS agent in the chest in a threatening manner); *United States v. Sommerstedt*, 752 F.2d 1494 (9th Cir. 1985) (holding that the use of any force whatsoever can be an assault on a federal officer).

[8] *See United States v. Mtola*, 598 F. App'x 416, 421 (6th Cir. 2015); *United States v. Waweru*, 628 F. App'x 608, 611 (10th Cir. 2015); *United States v. Street*, 66 F.3d 969, 977 (8th Cir. 1995); *United States v. Walker*, 835 F.2d 983, 987 (2d Cir. 1987).

In *Sophin*, a Border Patrol agent, Mossman, stopped the defendant at a checkpoint and asked if he was traveling alone. Sophin acknowledged that he was but refused to answer Mossman's repeated questions about his nationality. Mossman turned to look over his shoulder intending to refer Sophin to an area directly behind him for further questioning. Simultaneously, Sophin said, "Okay, thanks, good night," and drove away.

The court held that Sophin did not, by driving away, "display a forceful action *toward* Agent Mossman of any kind, let alone an action that would reasonably 'inspire fear of pain, bodily harm, or death.'" *Id*. at 967 (emphasis added). The court highlighted Mossman's testimony that:

> [W]hen Sophin drove away, [he] did not "rev up his engine," threaten Agent Mossman, attempt to run Agent Mossman over, and did not "take off, leaving tire marks" at the Checkpoint. . . . Agent Mossman did not "have to jump out of the way of [Sophin's] car," and he did not attempt to reach into Sophin's car to try to grab the steering wheel. Agent Mossman explained that he did not reach into the car because: "I weigh 270 pounds. That car is probably 4,000 [pounds]. It would drag me anywhere."

*Id.* at 960. "While it may be objectively reasonable that Agent Mossman feared putting his arm in Sophin's [vehicle] as Sophin drove away," the court reasoned, "there was no corresponding display of force *on Sophin's part* that would have 'inspired' Agent Mossman's fear." *Id.* at 967–68 (emphasis added). Indeed, "[a]t the moment Sophin drove away, Agent Mossman was not touching the car, advancing toward the car, [or] leaning in toward the car." *Id.* at 968. And, "to the extent driving at the speed limit could constitute a 'display of physical aggression,' the fact that Sophin was driving *away* from Agent Mossman indicates that he was not directing any physical aggression *toward* Agent Mossman." *Id.* (emphasis in original); *see also United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) ("The use of a car purely for flight," without intent to use the car as a deadly weapon, "would not involve the element of force.").

None of this suggests "that driving away can *never* constitute a forcible interference under § 111(a)(1)." *Sophin*, 153 F. Supp. 3d at 970. Indeed, in *Carter v. United States*, the Fifth Circuit found a "manifestly [] forcible interference" when a defendant sped away from a "juke joint" at 60 miles an hour with an IRS agent, Poe, hanging out of his convertible. 231 F.2d 232, 235 (5th Cir. 1956). Agent Poe, who was executing a search warrant for evidence of illegal gambling activity, approached the vehicle, opened the door, and reached for his badge in his back pocket. He was standing "neither in nor out [of the car], but with the door slightly open, one foot on the floor, one hand on the back of the front seat, and the other on the vent shield." *Id.* at 234. The defendant "abruptly start[ed] up the car and then perversely continue[d] driving it at a constantly increasing speed while Poe was precariously perched[,] desperately struggling to maintain his hold and get in the car to avoid serious and certain injury were he to fall." *Id.* at 235.

The distinctions between *Sophin* and *Carter* are not subtle. Sophin drove away *from* the agent at a safe speed; Carter drove away *with* the agent hanging onto his car at 60 miles per hour. The officer in *Sophin* testified that he did not reach into the defendant's vehicle because it would have dragged him away. *Sophin*, 153 F. Supp. 3d at 960. SA Carl made the opposite choice, breaching the truck window *after* the Defendant had already begun to drive away. ECF No. 46 at 5 (Government's acknowledgment that SA Carl breached the lower corner of the driver's window "[s]imultaneously with the defendant driving away").

SA Carl's *own* decision to smash the window *as* the Defendant moved forward, does not, under these circumstances, render the forward movement "force" directed *toward* or *against* an officer. *See, e.g.*, *Forcible*, Black's Law Dictionary. Here, as in *Sophin*, "there was no corresponding display of force *on [the Defendant]'s part* that would have 'inspired' Agent [Carl]'s fear." *Id.* at 967–68 (emphasis added). If the Defendant had driven away or continued driving

*knowing* that Carl's arm was in his window or otherwise driven in a way that threatened Hernandez or Carl, the Court would agree that the Government had stated an offense under § 111(a). As it is, however, the window breach is barely perceptible in the body camera footage of the incident because it happens so quickly, and the Defendant did not maneuver his vehicle in a way that would reasonably have inspired the officers' fear.

The Court concludes that the Government cannot prove beyond a reasonable doubt that the Defendant "forcibly" resisted, opposed, or interfered with the officers' duties within the meaning of 18 U.S.C. § 111(a). Accordingly, that count must be dismissed.

### 2.  Defendant did not "inflict" injury upon SA Carl

The Defendant similarly asserts that the penalty enhancement for "inflict[ing] bodily injury" under § 111(b) is inapplicable here because SA Carl "inflict[ed]" his own injury by punching the car window. ECF No. 37 at 2–6. Again, the Court agrees.

The Fifth Circuit has acknowledged that "§ 111 is not a model of clarity and does not specify the level of force required for a violation of § 111(b). Nor does the statute define 'bodily injury' as that term is used in § 111(b). Such a definition, if contained in the statute, would likely shed some light on the amount of force required for a conviction under § 111(b)." *Hernandez-Hernandez*, 817 F.3d at 215.

In construing "bodily injury" under the statute, the Fifth Circuit has relied on the U.S. Sentencing Guidelines, which define "bodily injury" as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1 (commentary 1(b)). Applying this definition, the Fifth Circuit has sustained an enhanced penalty for "bodily injury" based on "obviousness" even when the victim "did not aver that [being punched in the nose] caused her to be injured, that she suffered pain, or that she sought

medical attention." *United States v. Washington*, 500 F. App'x 279, 282 (5th Cir. 2012) ("[I]t is not difficult to describe being punched in the nose with a closed fist as sufficiently obvious for the purpose of the bodily-injury enhancement; and it is enough to reason that such an injury is the type for which most victims would seek medical treatment.").

Given the Fifth Circuit's expansive understanding of "bodily injury," the meaning of "inflict" defines the scope of the enhanced penalty.[9] The Government insists that "to inflict" requires no more than mere but-for or proximate causation. ECF No. 47 at 6–7 (citing *United States v. Garcia-Camacho*, 122 F.3d 1265 (9th Cir. 1997)); *see also* ECF No. 29, 7/10 Hr'g Tr. at 11 ("If the defendant hadn't evaded in his motor vehicle, the injury wouldn't have happened. It was the defendant's evading and resisting. Those acts caused the bodily injury.").

The Government relies on the Ninth Circuit's reasoning in *Garcia-Camacho*, for the proposition that, essentially, SA Carl's conduct is irrelevant. 122 F.3d at 1265. There, an undocumented alien attacked a Border Patrol agent attempting to detain him and, in the ensuing struggle to get the defendant to the ground, the agent fell and injured his ankle. The Ninth Circuit rejected the defendant's argument that the injury was a result of the agent's conduct and not his own: "Distinguishing between the conduct he initiated (the initial struggle) and the conduct the agent initiated (the arrest), Appellant artificially attempts to turn a continuous action into a series of separate events." *Id* at 1268–69.

The Defendant, in contrast, relies on the Sixth Circuit's ruling in *United States v. Zabawa*, for the proposition that "inflicts" requires a more restrictive definition than *legal* causation because it "conveys a sense of physical immediacy: to cause harm directly by physical force." 719 F.3d 555, 560 (6th Cir. 2013). In *Zabawa*, a defendant in federal custody became agitated, lunged at an

---

[9] Moreover, the Defendant does not dispute—and the Court does not doubt—that SA Carl suffered a bodily injury when he cut himself while breaking the Defendant's car window.

agent, and started punching him. Although the agent blocked the initial attack, a fight ensued in which the officer headbutted, kneed, and elbowed Zabawa until he was able to get him on the floor and handcuff him. During the fight, the agent suffered a cut over his eye that required six stitches. The agent later testified that he did not know whether the cut happened when he headbutted Zabawa or when Zabawa punched him.

The Sixth Circuit left Zabawa's conviction under § 111(a)(1) intact but reversed his conviction under § 111(b), finding that the evidence was insufficient because "the relevant facts [were] undisputed: the cut over Murphy's eye might have resulted from [the agent's] own headbutt, rather than from a punch by Zabawa." *Id.* at 559. The court concluded that "the government did not prove that Zabawa inflicted [the agent's] laceration for purposes of § 111(b)," reasoning that "inflict" is a more specialized term than "cause" that refers to *physical*, not proximate, causation. *Id.* at 560.

While the Court generally agrees that "inflict" should be defined more restrictively than "cause," it need not determine the precise scope of the distinction here. Rather, in this Court's view, the Defendant did not "inflict" SA Carl's injuries under even the Ninth Circuit's broader reading because the Defendant did not, by driving away, *initiate* the triggering force. Indeed, it appears that SA Carl sought to breach the truck window, not in response to the truck moving away but based on the Defendant's failure to roll down his window, which could not, under any definition, constitute "force." *Compare* ECF No. 47 (Government brief stating that the Defendant drove away "just as he was about to breach the window"), *and* 8/25 Hr'g, GEX 1 at 2:25 (showing same), *with* ECF No. 60, 8/25 Hr'g Tr. at 78:24–25 (Carl's testimony that he hit the window *because* the vehicle started moving forward).

In any event, unlike bringing an actively violent defendant to the ground to subdue him, breaking the Defendant's window was not reasonably calculated to stop the purported "force" at issue here—driving away. *See Sophin*, 153 F. Supp. 3d at 960 (noting that the agent did not reach into the defendant's vehicle as he drove away based on his reasonable fear that the vehicle would drag him away). Assuming that "driving away" here constituted force, the Court might agree that the Defendant "inflicted" Carl's injuries if Carl had hurt himself by, say, slashing the Defendant's tires as he drove away in an effort to slow him down. *See Garcia-Camacho*, 122 F.3d at 1268–69 (rejecting the defendant's attempt "to turn a continuous action into a series of separate events").

As it is, however, SA Carl's breach of the window appears to be one of a series of separate events rather than a "continuous action" initiated by the Defendant. The Seventh Circuit provided a useful analogy in locating the middle ground between the positions taken by the Sixth and Ninth Circuits:

> Doubtless "inflict" is more restrictive than "cause"; if [the defendant] had not resisted, but [the officer] had tripped on his untied shoelaces while walking over to apply handcuffs, it would not make sense to say that [the defendant] had "inflicted" an injury. But the actual injury occurred while [the officer] was grappling with [the defendant], who applied force directly to [the officer]'s person. This satisfies the normal understanding of "inflict."

*United States v. Jackson*, 310 F.3d 554, 557 (7th Cir. 2002). As in *Zabawa*, it is not clear from the video footage if the moving truck caught SA Carl's arm or the force of his own blow caused his cut when he broke the window. Here, because the Defendant did not initiate the physical contact in question by applying (or even threatening) force toward or against SA Carl's person, he did not "inflict" SA Carl's injury under any reading of 18 U.S.C. § 111(b).

The Government's attempt to complicate the matter is unavailing. As the Fifth Circuit explained in *Williams*, "[t]he Ninth Circuit's concern about the difficulty of determining whether a *defendant* [is] culpable for physical contact *initiated by an arresting officer* was misplaced, since

any such contact would not have been "*forcibly*" initiated by the defendant and thus *would not be proscribed by the statute*." *Williams*, 602 F.3d at 317–18 (endorsing Sixth Circuit's interpretation of earlier version of statute). In short, the Fifth Circuit's ruling in *Williams* confirms this Court's conclusion that the Defendant cannot have "inflicted" SA Carl's injuries because the Defendant did not direct any force against Carl in the first place. *Cf. Hernandez-Hernandez*, 817 F.3d at 217 (concluding that the defendant's "conviction under § 111(b) necessarily required a finding that he intentionally used, attempted to use, or threatened to use physical force *against the person of another* [and, thus, that] that *§ 111(b) is categorically a crime of violence*") (emphasis added).

As the evidence does not satisfy the definition of "inflict", the Government cannot prove beyond a reasonable doubt that the Defendant inflicted SA Carl's scrape under U.S.C. § 111(b).

### 3. Intent to move vehicle and awareness of federal officers

Given the Court's conclusion that the Defendant did not forcibly interfere with Carl's duties, it need not reach the remaining arguments in his first motion to dismiss—that the Government cannot prove that he intentionally moved the vehicle or that he knew SA Carl was a federal officer. *See* ECF No. 37 at 6–7. Still, the Court observes that that the Defendant would be unlikely to independently prevail on either argument.

While the video footage of the incident does not suggest that the Defendant intended to threaten or injure the officers by driving away, it does not suggest that the truck moved accidentally either. The Defendant pulled his truck and trailer away from SA Carl and drove about two car lengths before other officers pulled in front of his truck. When the agents blocked his path, the Defendant stopped and reversed, stopping again when the trailer touched one of the agent's cars.

Similarly, the Defendant argues that Government cannot prove beyond a reasonable doubt that he knew that SA Carl was a federal officer because many of the agents wore plain clothes,

drove unmarked vehicles, and he could not read English that was written on their clothing, nor could he understand the English commands that the agents gave him. ECF No. 37 at 8–9.

But the evidence shows that the Defendant pulled over in response to the agents' blue and red emergency lights. In the Government's video, DO Hernandez wears a tactical vest with "POLICE" placards on the front and back of the vest as he approached the truck. He testified that he announced his presence to the Defendant as he approached the truck, speaking in both English and Spanish. The Defendant appears to have understood the commands, given that he produced his identification card in response to DO Hernandez's instructions.

Thus, it seems that the Defendant believed that DO Hernandez and SA Carl were officers of some kind, even if he was not aware that they were federal officers. Under the Fifth Circuit Pattern Jury charge for 18 U.S.C. § 111, however, the Government need not prove that the Defendant knew they were *federal* officers. *See* Pattern Crim. Jury Instr. 5th Cir. 2.07 (2024); *United States v. Moore*, 958 F.2d 646, 649 (5th Cir. 1992); *see also United States v. Lopez-Sanchez*, No. 21-60082, 2021 WL 5119714 at *1–2 (5th Cir. Nov. 3, 2021) (per curiam). Rather, the instructions require proof "beyond a reasonable doubt that the person assaulted was, in fact, a federal officer acting in the course of his [her] duty and that the defendant intentionally committed a forcible assault upon that officer." Pattern Crim. Jury Instr. 5th Cir. 2.07 (2024). While a defendant with a reasonable, good faith belief that he "needed to defend himself [] against an assault by a *private citizen*," would not be guilty of an assault, the evidence presented at the hearing does not create a reasonable doubt as to the Defendant's state of mind.

Still, based on the definitions of "forcibly" and "inflicts", the Court concludes that the Government has failed to state an offense or basis for a penalty enhancement under 18 U.S.C. § 111 and that the count must be dismissed.

II.      **Motion to Suppress and Dismiss for Constitutional Violations (ECF No. 38)**

The Defendant challenges his stop and arrest as unconstitutional on three grounds, arguing that (1) the initial stop and (2) the expanded scope of the seizure violated his Fourth Amendment rights and that (3) the officers' conscience-shocking and outrageous conduct violated his Fifth Amendment right to due process. ECF No. 38. He seeks to suppress the video footage and agents' statements and to dismiss the indictment.

A.      **Challenges under the Fourth Amendment**

The Immigration and Nationality Act ("INA") provides that immigration officers "may briefly detain" an individual "for questioning" if they have "a reasonable suspicion, based on specific articulable facts, that the person being questioned is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2); 8 U.S.C. § 1357(a)(1). An officer "must have a reasonable suspicion" to justify briefly stopping individuals to question them "about their citizenship and immigration status"; any further detention "must be based on . . . probable cause." *United States v. Brigoni-Ponce*, 422 U.S. 873, 881–82 (1975) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

Under *Terry*, the legality of police investigatory stops is tested in two parts. 392 U.S. 19–20; *United States v. Bringham*, 382 F.3d 500, 506 (5th Cir. 2004). Courts first inquire whether the officer's action was justified at its inception and then examine whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Terry*, 392 U.S. at 20.

"The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (citing *Terry*, 392 U.S. at 19). "Reasonableness, of course, depends 'on a balance between the public interest and the

individual's right to personal security free from arbitrary interference by law officers.'" *Brignoni-Ponce*, 422 U.S. at 878. The Supreme Court has emphasized that courts must allow law enforcement "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

### 1. The Officers had reasonable suspicion to conduct the *Terry* stop

The Defendant argues that the agents lacked reasonable suspicion or probable cause at the time of the investigative stop.

Reasonable suspicion requires more than an unparticularized hunch; it must be based on specific and articulable facts, combined with rational inferences drawn from those facts, that reasonably warrant the stop. *United States v. Lopez-Moreno*, 420 F.3d 420, 425 (5th Cir. 2005). The reasonable suspicion inquiry turns on the "totality of the particular circumstances." *Brignoni-Ponce*, 422 U.S. at 885 n.10; *Arvizu*, 534 U. S. at 273.

The Government contends that it began its operation based on a tip. A court determining whether a tip can establish reasonable suspicion must consider:

> (1)    the credibility and reliability of the informant;
>
> (2)    the specificity of the information contained in the tip or report;
>
> (3)    the extent to which the information in the tip or report can be verified by officers in the field; and
>
> (4)    whether the tip or report concerns active or recent activity or has instead gone stale.

*United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (citation omitted). In other words, reasonable suspicion "is dependent upon both the content of the information possessed by police and its degree of reliability." *Id.*

The first factor—the credibility and reliability of the informant—deserves special scrutiny in this case. DO Hernandez testified that HSI received the tip from a tipline in Alpine, Texas and that officials there forwarded the tip to him. ECF No. 60, 8/25 Hr'g Tr. at 4:19–5:5. Although the tip identified the tipster's name, the Government did not produce any report or documentation of its attempts to corroborate the information provided by Ms. Torres-Molinar or assess her credibility. DO Hernandez states that he contacted the tipster prior to the operation "to see if she had any additional information and to confirm the address," *id.* at 12:22–23, but could not provide a date or time for this alleged phone call and acknowledged that he did not document it anywhere. Hernandez admitted that he did not search for Ms. Torres-Molinar's name in any criminal databases. *Id.* at 45:1–8. Nor did he call her daughter to corroborate the information Ms. Torres-Molinar provided; indeed, Hernandez testified that he did not even get the daughter's name during his alleged phone call with Ms. Torres-Molinar. *Id.* at 45:9–46:12.

As to the second factor, while the tip was specific as to the address and vehicle driven by the Defendant, it only provided vague assertions of criminal activity and illegal presence in the United States. DO Hernandez testified that he confirmed the Defendant's address with the tipster but did not ask anything further about the basis for her belief that the Defendant was undocumented. *See id.*

Under the third factor, DO Hernandez testified that he verified *some* aspects of the tip. For example, he testified that he conducted surveillance of the address and observed vehicles with the plate numbers that the tipster provided. *Id.* at 18:23–19:4. He also testified that he looked at databases verifying that vehicles registered in the Defendant's name came back to the address provided by Ms. Torres-Molinar. *Id.* at 69:21–70:4. DO Hernandez's efforts to determine the Defendant's immigration status were more problematic. He testified that he searched various

databases that could have revealed the Defendant's immigration status, including asylum applications and/or any adjustment status. *Id.* at 10:8–12:16. Based on DO Hernandez's testimony, any order of removal should have been discovered in the databases he queried. As stated above, although there was no order of removal for the Defendant, DO Hernandez proceeded with the arrest operation anyway.

As to the last factor—whether the tipster's information is recent or stale—there is no information in the record showing that DO Hernandez asked Ms. Torres-Molinar about the basis for her belief that the Defendant was undocumented. As noted above, DO Hernandez testified that he attempted to verify the Defendant's immigration status through database inquiries.

The Court is concerned about the seemingly incomplete efforts the Government took to investigate the tip before planning and executing an operation to seize the Defendant. There are undoubtedly U.S. citizens born in other countries with identification cards bearing evidence of their foreign births. By virtue of their automatic citizenship, such citizens would have no need to appear in any immigration-related database. *See Automatic Acquisition of Citizenship after Birth (INA 320)*, USCIS Policy Manual, 12 USCIS-PM H.4, 2014 WL 10102583 ("A person born outside of the United States who automatically acquires U.S. citizenship is not required to have evidence of such status."); *see also Matter of Tijerina-Villarreal*, 13 I. & N. Dec. 327, 330 (BIA 1969) ("The burden to establish alienage in a deportation proceeding *is upon the Government*. When there is a claim of citizenship, however, one born abroad is presumed to be an alien and must go forward with the evidence to establish his claim to United States citizenship.") (emphasis added).

Nonetheless, given recent orders on the Supreme Court's emergency docket, the constellation of facts would seem to support a conclusion that reasonable suspicion existed to believe that the defendant was an alien who might be in the country without lawful status,

justifying an investigatory stop to question him. *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *5 (U.S. Sept. 8, 2025) (granting emergency stay of district court's injunction prohibiting immigration officers from relying solely on (i) presence at particular locations such as bus stops, car washes, day laborer pickup sites, agricultural sites, and the like; (ii) the type of work one does; (iii) speaking Spanish or speaking English with an accent; and/or (iv) apparent race or ethnicity to form reasonable suspicion of an immigration violation).[10]

### 2. The expansion of the seizure was unreasonable

The Defendant argues that, even if the initial stop was justified, the intensity and scope of the seizure far exceeded what the Fourth Amendment permits. ECF No. 38 at 10–16.

### a. The window break was an unreasonable expansion of the seizure

The limits of permissible conduct during an investigative stop are governed by the purposes of the stop:

> If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a federal official issues an administrative document called a 'Notice to Appear.' *See* 8 U.S.C. § 1229(a); 8 CFR § 239.1(a). The form does not authorize an arrest. Instead, it gives the alien information about the proceedings, including the time and date of the removal hearing. *See* 8 U.S.C. § 1229(a)(1).

*Arizona v. United States*, 567 U.S. 387, 407 (2012).

When a stop is constitutionally valid at its inception, courts ask if "the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop" or to

---

[10] Because the Supreme Court apparently demands that lower courts follow orders delivered through its emergency docket, the Court attempts to do so here. *See Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part) ("[D]ecisions regarding interim relief are not necessarily 'conclusive as to the merits' because further litigation may follow. But regardless of a decision's procedural posture, its '*reasoning*—its *ratio decidendi*'—carries precedential weight in 'future cases.'") (internal citation omitted) (emphasis added).

dispelling new reasonable suspicion that arose during the stop. *United States v. Brigham*, 382 F.3d 500, 506–07 (5th Cir. 2004) (en banc).

An investigatory seizure can be expanded in two ways requiring commensurate reasonable suspicion. One is an expansion of duration. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015). The other—relevant here—is an expansion of intensity beyond the level of force justified by the officers' suspicions. *See Florida v. Royer*, 460 U.S. 491, 501–02 (1983); *United States v. Zavala*, 541 F.3d 562, 579–80 (5th Cir. 2008) (finding unreasonable expansion of seizure in part because the defendant was "handcuffed, placed in a police car, transported to different locations, and was not free to leave"). In sum, "the investigative methods employed [during a brief investigatory seizure] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Royer*, 460 U.S. at 500 (cleaned up).

To be sure, "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298–99 (1967). But "threats from outside the arrest scene do not 'lurk[ ] in all custodial arrests.'" *Riley v. California*, 573 U.S. 373, 388 (2014) (quoting *United States v. Chadwick*, 433 U.S. 1, 14–15 (1977)). "The court must determine case by case whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *United States v. Sanders*, 994 F.2d 200, 206–07 (5th Cir. 1993).

Before the Defendant's truck moved forward, Carl was not justified in conducting a window break. The Defendant properly analogizes to *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). There, a grandmother driving her 2-year-old granddaughter was pulled over for speeding, and the grandmother told the officer the speeding claim was "bullshit." *See id.* at 161. The officer asked her to step out, and she refused. *Id.* The officer said he would call child protective services

to pick up her granddaughter, and she responded by rolling up her window and calling family members. *Id.* The police chief arrived and told her to roll down her window or he would break it, but the grandmother refused as she was waiting for her husband to come pick up the child. *Id.* at 161–62. The chief then broke the window with a flashlight, grabbed her through the window, opened the door, and the chief and other officer threw her against the vehicle, handcuffed her, and led her to their cruiser. *Id.* at 162.

Reversing the district court's grant of qualified immunity on the grandmother's excessive force claim under 42 U.S.C. § 1983, the panel noted that "there was no reason to believe that her actions posed a threat to the officers, herself, or to her grandchild" and that "her resistance was, at most, passive." *Id.* at 167. Thus, a reasonable jury could infer that the degree of force used to secure compliance was unjustifiable because the chief "engaged in very little, if any, negotiation" and "instead quickly resorted to breaking [the] driver's side window and dragging [the grandmother] out of the vehicle." *Id.* at 168. The panel concluded that the facts were "sufficiently egregious to warrant a denial of qualified immunity because a reasonable officer would have known that the degree of force was unconstitutionally excessive under the circumstances." *Id.* at 169; *see also id.* ("Both parties' experts agree that continued negotiations are more appropriate than actual force where the suspect is only stopped for a minor traffic offense and is making no attempt to flee.").

The Government insists that SA Carl was justified in breaking the window because the Defendant's failure to roll down his window and use of his cell phone created concerns about officer safety. ECF No. 46 at 9–14. But, again, at the time of the stop, nothing about the circumstances justifying the stop or the Defendant's behavior posed a threat to officer safety.

First, for all the Government's handwringing about possible "criminal activity—in this case [being] an alien illegally in the country," *see, e.g.*, ECF No. 46 at 13—it's worth noting that the basis for the *Terry* stop—the Defendant's allegedly unauthorized presence in the United States—is a *civil* offense. *Arizona*, 567 U.S. at 407 ("As a general rule, it is not a crime for a removable alien to remain present in the United States."); *see also id.* at 396 ("Removal is a civil, not criminal, matter."); *Texas v. United States*, 809 F.3d 134, 148 n.14 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (describing unlawful presence in the United States as "a civil offense") (citing 8 U.S.C. §§ 1182(a)(9)(B)(i), 1227(a)(1)(A)–(B)).

The Government implies in its briefing that, because it is governed by federal law, an immigration violation is more serious than minor traffic violations involved in other *Terry* stop cases. *See* ECF No. 46 at 10 (citing *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (speeding); *Solis v. Serrett*, 31 F.4th 975, 979 (5th Cir. 2022) (driver suspected of driving while intoxicated); and *Priest v. Grazier*, 860 F. App'x 343, 344–45 (5th Cir. 2021) (driver, in the midst of a diabetic episode, was stopped in the middle of the road, straddling two lanes, impeding traffic, and with the engine running)). But, unlike an alien's mere *presence* in the country, many "minor" traffic offenses—e.g., speeding, driving while intoxicated, or blocking traffic—present genuine dangers to public safety.[11]

Second, while the Defendant did not immediately roll down his windows, it would be inaccurate to describe him as wholly non-compliant. He pulled over and stopped the car when the agents activated their lights and produced his ID card when asked. It would be even more inaccurate to describe the Defendant's behavior as threatening. Despite purportedly fearing for their safety because the Defendant was making a phone call, the agents did not bother to ask him

---

[11] *See also Tennyson v. Villarreal*, 801 F. App'x 295, 296 (5th Cir. 2020) (disruptive situation involving at least eight non-compliant detainees).

any questions about who he was calling or why. Indeed, in the body camera footage, the agents' behavior and remarks smack of impatience, not fear. *See* 8/25 Hr'g, GEX 1 at 01:38–40 (SA Carl stating, "I'm going to go get my window break; I ain't got time for this.").

Before the Defendant moved his car, breaching the driver-side window was certainly not the "least intrusive means reasonably available to verify or dispel the officer's suspicion." *Royer*, 460 U.S. at 500 (cleaned up). DO Hernandez estimated that three to five minutes elapsed between the initial stop and the window breach. ECF No. 60, 8/25 Hr'g Tr. at 30:6–9. In that time, the agents did not bother to ask any questions about their suspicion that the Defendant was present in the country illegally or dispel their purported safety concerns. SA Carl's premature decision to breach the window unjustifiably increased the intensity of the encounter, perhaps due to his mistaken belief that he was executing an arrest warrant.[12]

### b. The warrantless arrest was not justified under 8 U.S.C. § 1357(a)(2)

The Government cites 8 U.S.C. § 1357(a)(2) in support of its authority to arrest the Defendant without a warrant. *See* ECF No. 46 at 6.

Section 1357(a)(2) allows an official to conduct a warrantless arrest if he has *reason to believe* that an alien (a) is unlawfully present in the United States and (b) is likely to escape before a warrant can be obtained for the arrest. 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2). "Reason to believe" is "considered the equivalent of probable cause," *Au Yi Lau v. U.S. Immigr. &*

---

[12] While courts must allow law enforcement "officers to draw on their own experience and specialized training" to assess the circumstances, SA Carl's inferences about the situation—based on his unfounded assumption that he was executing a warrant and that the Defendant was subject to an order of removal—are not entitled to such deference. *Arvizu*, 534 U.S. at 273. Indeed, DO Hernandez appears to have misled his own team by concealing that there was no order of removal for the Defendant nor warrant for his arrest. DO Hernandez also acknowledged at the hearing that he has verbal instructions from superiors to break car windows. See ECF No. 60, 8/25 Hr'g Tr. at 72:15–23. "[G]ood faith on the part of the arresting officers is not enough.'" *Beck v. Ohio*, 379 U.S. 89, 96 (1964) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id.* at 97.

*Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971), which "must be particularized with respect to the person to be searched or seized," *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004). Section 1357(a)(2) must be construed within the limits of the Fourth Amendment because Congress cannot statutorily create exceptions to Constitutional Amendments. *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973).

Based on the totality of the circumstances, the Court will assume that the Defendant's attempt to drive away from the scene supports probable cause to believe that he had committed an immigration violation.[13] *Flores*, 381 F.3d at 402. Further, the Court is satisfied that *as the Defendant was driving away*, the officers had reason to believe he was likely to escape before they could obtain a warrant. But the likelihood of the Defendant's escape—and thus the basis for his arrest—evaporated once he was blocked in by the TX-DPS vehicles. The Government admits as much in its briefing, purporting to rely on a counterfactual: "[i]f Texas DPS had not been positioned ahead, defendant *would have* fled the scene." ECF No. 46 at 11 (emphasis added). But DPS *was* at the scene, and the Defendant was *unable* to flee. "Reason to believe"—or "probable cause"—is judged based on the circumstances *at the moment of arrest*, not on hypothetical counterfactuals. *Flores*, 381 F.3d at 402.

The Government offers no argument or evidence to establish that, at the time of the arrest, the agents had reason to believe that the Defendant was likely to escape before a warrant could be

---

[13] To be clear, neither Hernandez nor Carl asked the Defendant any questions about his immigration status during the stop until after he had already been arrested. Thus, the Court cannot say that the forward movement of the Defendant's truck established probable cause as to an *immigration* violation.

obtained for his arrest. *See generally* ECF No. 46; 8 U.S.C. § 1357(a)(2). The Court will not assume that a warrant would be untimely without any argument or evidence about immigration officers' process and timeline for producing administrative warrants. Indeed, the Supreme Court has recognized that "technological developments that enable . . . officers to secure warrants more quickly . . . are relevant to an assessment of exigency." *Missouri v. McNeely*, 569 U.S. 141, 155 (2013); *see also id.* at 173 (Roberts, J., concurring in part) (noting that, in some jurisdictions, warrants can be issued "in as little as five minutes" and the process can be conducted over email). Indeed, by failing to describe the warrant procedure at all, the Government seeks the kind of *per se* rule that the Supreme Court has rejected in evaluating exigency under the Fourth Amendment. *See id.* at 156 (rejecting state's proposed rule that the natural metabolization of alcohol in the bloodstream presents a *per se* exigency, because exigency must be determined case by case based on the totality of the circumstances).

At bottom, the Government stopped the Defendant based on a suspicion that he did not have the right paperwork to be legally present in the United States. *See* ECF No. 60, 8/25 Hr'g Tr. at 61:15–21. The Defendant challenges his arrest on the same basis: the Government did not have the right paperwork to arrest him—a warrant. The Government has not established that the warrantless arrest was justified under the circumstances. "If the government finds filling out forms a chore, it has good company. The world is awash in forms, and rarely do agencies afford individuals the same latitude in completing them that the government seeks for itself[.]" *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021). "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Id.* at 172.

### c. The force used to effect the arrest was constitutionally excessive

"[O]nce a motor vehicle has been lawfully detained for a traffic violation, . . . officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable . . . seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *see United States v. Meredith*, 480 F.3d 366, 369 (5th Cir. 2007) (holding under the Fourth Amendment, "a law enforcement officer making a traffic stop [can] order the driver and any passengers to exit the vehicle pending completion of the stop").

While "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham v. Connor*, 490 U.S. 386, 396 (1989), the Fourth Amendment enshrines the right to be free from excessive force. *See Bush v. Strain*, 513 F.3d 492, 500–01 (5th Cir. 2008). "Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville*, 567 F.3d at 167. But "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Id.* (citing *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

Excessive force claims are necessarily fact-intensive; whether the force used is "excessive" or "unreasonable" depends on the "totality of the circumstances." *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985); *see also Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case"). In making this determination, the Fifth Circuit has instructed courts to apply the so-called *Graham* factors, which include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is *actively* resisting arrest or attempting to evade arrest by flight. *Poole v. City of Shreveport*, 691 F.3d 624, 638 (5th Cir. 2012)

(quoting *Graham*, 490 U.S. at 396) (emphasis added). The underlying intent or motivation behind an officer's actions is irrelevant to this determination. *See Poole*, 691 F.3d at 628.

Whether the officers' use of force in aiming their firearms at the Defendant, pulling him from his truck, and shoving him to the ground before handcuffing him was constitutionally excessive depends on whether the officers reasonably perceived him as a threat. The Court has already found that the Officers could not reasonably have perceived the Defendant to be threat to their safety given the basis for the *Terry* stop (i.e., suspicions about his immigration status). Moreover, at the time of his arrest (after his truck was blocked in between law enforcement vehicles), the Defendant was engaged only in passive resistance.

Thus, the Court agrees that the officers engaged in constitutionally excessive force. *See Castro v. Kory*, No. 23-50268, 2024 WL 1580175, at *4 (5th Cir. Apr. 11, 2024) (holding that pointing firearms at an unarmed, confused, and only mildly disruptive suspect, forcibly removing him from his vehicle, and then tackling and handcuffing him "*was clearly disproportionate* to [the suspect's] resistance, *which did not endanger the police*") (emphasis added); *see also Flores v. Rivas*, No. EP-18-CV-297-KC, 2020 WL 563799, at *7 (W.D. Tex. Jan. 31, 2020) ("It is . . . objectively unreasonable for a police officer to forcefully brandish a deadly weapon at citizens whom he could not reasonably have perceived to be dangerous."); *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018) (holding that "it [is] clearly established . . . that pushing . . . a suspect who is neither fleeing nor resisting is excessive").

The Fifth Circuit has acknowledged the argument that "the use of excessive force in arresting is in violation of the Constitution and thus deserving of deterrence by the exclusionary rule." *Delaney v. Giarrusso*, 633 F.2d 1126, 1129 n.2 (5th Cir. 1981) (citing W. La Fave, Search and Seizure: A Treatise on the Fourth Amendment s 5.1(d) at 240 (1978 & 1980 Supp.)). Because

the Supreme Court has foreclosed the possibility that individuals subject to constitutionally excessive force by federal immigration officers will be able to recover damages under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), suppression of the evidence and dismissal of the indictment are the only relief available to the Defendant in this Court and, at this stage, the only adequate deterrent for the officers' conduct. *See Egbert v. Boule*, 596 U.S. 482, 498 (2022).

Accordingly, the Court will suppress all observations and recordings (visual and audio) of the Defendant's alleged resistance and dismiss the indictment based on the constitutionally excessive force deployed during the Defendant's arrest.

### B. Fifth Amendment Challenges

#### 1. The officers' conduct was not conscious-shocking

The Defendant argues that the indictment should be dismissed because law enforcement officers engaged in conduct that shocks the conscience by breaking his window and using constitutionally excessive force during his arrest. ECF No. 38 at 17 (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)).

In *Rochin*, the Supreme Court held that due process bars the government from prosecuting a defendant if its agents engage in conduct that "shocks the conscience." 342 U.S. at 172 (finding due process violation where law enforcement officers forcefully pumped emetic solution through a tube into the defendant's stomach causing him to vomit up two capsules of morphine). But, as the Court has since made clear, "only the most egregious official conduct," *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), can be "characterized as arbitrary, or conscience shocking, in a constitutional sense," *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992). Conduct shocks the conscience only when it is "so 'brutal' and 'offensive' that it did not comport with

traditional ideas of fair play and decency." *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 244 (5th Cir. 2025) (quoting *Lewis*, 523 U.S. at 847). "[O]nly a purpose to cause harm unrelated to the legitimate object of arrest" will offend due process. *Lewis*, 523 U.S. at 836. "[E]ven precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates'" constitutional protections. *Id.* at 853.

The agents' conduct at the scene does not meet that demanding threshold. The agents had reasonable suspicion to stop the Defendant's truck, and based on settled precedent, their commands to roll down the window and/or exit the vehicle were lawful. While the agents' conduct in *effecting* the arrest—pulling the Defendant out of the vehicle, pinning him to the ground, and handcuffing him while cursing at him—is disturbing, the Court cannot conclude that it was "so 'brutal' and 'offensive' that [they] did not comport with traditional ideas of fair play and decency," *Parker*, 140 F.4th at 244, or that the agents had "a purpose to cause harm unrelated to the legitimate object of arrest," *Lewis*, 523 U.S. at 836. Further, it is disturbing that HSI supervisory or managerial personnel are apparently encouraging that car windows be summarily broken, but the parameters of these verbal or written directives were not fully explored at the hearing in this case. *See* ECF No. 60, 8/25 Hr'g Tr. at 72:15–23.

Although the officers' force at the time of Defendant's arrest was constitutionally excessive, the Court will not dismiss the indictment on the independent basis that the official conduct at the scene was conscious shocking.

## 2. The Government's conduct was—and has been—outrageous

The Defendant further asserts that the agents violated his due process rights by engaging in outrageous government conduct. *See* ECF No. 38 at 17–19.

"The due process clause protects defendants against outrageous conduct by law enforcement agents." *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986). "Government misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment." *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (citing *United States v. Russell*, 411 U.S. 423, 431–32 (1973)). "Such a violation will only be found in the rarest circumstances." *Johnson*, 68 F.3d at 902. And even cases recognizing such misconduct generally do not result in the dismissal of the indictment. *See, e.g.*, *United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009) (holding that the government's conduct was not so "shocking to the universal sense of justice" that the government should be deprived of the opportunity to prosecute the defendant) (quoting *Russell*, 411 U.S. at 432). The determination of "outrageous involvement turns upon the totality of the circumstances with no single factor controlling." *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981).

Most "outrageous conduct" cases involve allegations of entrapment or discovery misconduct by the Government, because "the outrageous-conduct defense requires not only government overinvolvement in the charged crime but a passive role by the defendant as well." *Arteaga*, 807 F.2d at 427. The defense is inapplicable "[w]here the court finds that the defendant is an *active*, *willing* participant in the criminal conduct that leads to his arrest." *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997) (internal citation omitted); *see Tobias*, 662 F.2d at 387. In *Tobias*, for example, the Fifth Circuit refused to apply the doctrine to a defendant who ordered chemicals from a government-operated front to manufacture cocaine and then attempted to cancel his order by telephone because he realized he did not have the requisite know-how to manufacture cocaine. 662 F.2d at 383–88. Tobias was persuaded by a government agent who

36

answered the phone to instead buy chemicals for the manufacture of PCP, explaining that making PCP would be like "baking a cake." *Id.* While acknowledging that the case "set the outer limits to which the government may go in the quest to ferret out and prosecute crimes," the Fifth Circuit rejected Tobias's due process argument and affirmed his conviction because he was "a predisposed active participant, motivated solely by a desire to make money." *Id.* at 387.

Viewing the totality of the circumstances, the Court finds that the Government's conduct in this case has been outrageous. Consider:

(1)    The marked deficiencies in Hernandez's investigations into the Defendant's immigration status and the reliability of the tip;

(2)    Carl's *assumption* that he was executing an arrest warrant and that the Defendant was subject to an order of removal;

(3)    Hernandez's failure to explain the grounds for the *Terry* stop to Carl or Fuentes or disclose the absence of any removal order or arrest warrant to his team;

(4)    Hernandez's failure to ask the Defendant any questions about his immigration status until after his arrest;

(5)    The agent's feigned concerns for their safety;

(6)    Carl's decision to breach the Defendant's window within minutes— "I ain't got time for this," 8/25 Hr'g, GEX 1 at 01:38–40—based on the Defendant's partial and passive non-compliance;

(7)    The Defendant's unjustified arrest;

(8)    The excessive force employed to effect the arrest;

(9)    Fuente's sworn affidavit based on Carl's inaccurate assumptions and blatant misstatements about the basis for the stop and the Defendant's conduct at the scene; and

(10)    The admission that HSI deploys some form of break car windows first and ask questions later policy.

Most egregiously, however, the Government has charged the Defendant with "forcibly" resisting a federal officer based on the *officer's* use of force. Not only is the indictment unsupported by the text of 18 U.S.C. § 111(a), but it "violates the principle of 'fundamental fairness'" by allowing an immigration officer to systematically circumvent the warrant requirement by manufacturing a felony. *Johnson*, 68 F.3d at 902; *cf. Williams*, 602 F.3d at 317–18 (reasoning that "physical contact *initiated by an arresting officer* [is not] '*forcibly*' initiated by the defendant and thus *[is not] proscribed by the statute*").

Nothing about the Defendant's conduct suggests "a predisposed active participant," *Tobias*, 662 F.2d at 387, directing force toward or against SA Carl. Nothing in the Defendant's behavior, before or after the truck moved indicates that the Defendant was predisposed to "forcibly" resisting arrest. He was, at most, passively non-compliant. Indeed, as the Court has explained, even as the Defendant moved his truck forward, he sought to *avoid* Carl. Despite the Government's absurd contention that "[t]he defendant had complete control over how the injury was inflicted," ECF No. 47 at 5, it was *Carl* who decided to break the truck window as it moved away. *Compare* ECF No. 60, 8/25 Hr'g Tr. at 89:22–90:1 (Carl acknowledging that he decided to break the window when the truck started moving), *with Sophin*, 153 F. Supp. 3d at 960 (officer explaining that he did not attempt to reach into the defendant's vehicle as it drove by because the car would drag him away).

At every stage of its investigation and the proceedings before this Court, the Government has approached the bounds of the Fourth Amendment and the warrant requirement in particular with indifference bordering on disdain. But "the warrant requirement is 'an important working part of our machinery of government,' not merely 'an inconvenience to be somehow 'weighed' against the claims of police efficiency.'" *Riley v. California*, 573 U.S. 373, 401 (2014) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 481 (1971)). A defendant's constitutional right to be free from

an unreasonable seizure does not yield to an officer's expectation that he will make an "easy target," 8/25 Hr'g, GEX 4, or his "assumption" that there is an arrest warrant, ECF No. 60, 8/25 Hr'g Tr. at 83:11–84:5, 85:1:10; 89:18–21, or his perception that he "ain't got time" to ask a non-violent suspect questions about the basis for a *Terry* stop before engaging in force, 8/25 Hr'g, GEX 1 at 01:38–40.

Given the Government's ever-shifting positions in this case, the Court will, in an abundance of caution, preemptively address another possible basis for the Defendant's warrantless arrest under the INA: probable cause to believe that he committed a felony under 18 U.S.C. § 111(a). Section 1357(5) permits immigration officers to "make arrests . . . for any *felony* cognizable under the laws of the United States, if the officer or employee has *reasonable grounds* to believe that the person to be arrested has committed or is committing such a felony." 8 U.S.C. § 1357(5) (emphasis added). Although the Government does not explicitly rely on this provision, the felony charge in this case, if vindicated, would provide a clear basis for the Defendant's arrest—and explain the Government's casual attitude toward the warrant requirement. After all, an immigration officer need not bother with the contours of the reasonable suspicion and probable cause standards or the practical demands of securing a warrant when, through his very own force, he can unilaterally engineer a predicate felony under § 1357(5). While the Court does not go so far as to accuse the Government of such bad faith conduct here, it is nonetheless cognizant of the risk that officers will be tempted, under the pressure of ever-increasing quotas, to cut constitutional corners.

The Defendant may very well be deportable; that is not for this Court to decide. But, on these facts, his indictment under 18 U.S.C. § 111(a) represents the rare case in which the Government's conduct is so "shocking to the universal sense of justice" that it should be deprived of the opportunity to prosecute the Defendant. 557 F.3d at 232. "The duty of a prosecutor, as the

representative of the sovereign in a criminal case, is not that it shall win a case but that justice shall be done." *Dickson v. Quarterman*, 462 F.3d 470, 479 (5th Cir. 2006) (cleaned up). Concluding that a federal officer's self-inflicted injuries—arising from his own use of force—can create criminal liability would allow the exception to the warrant requirement to swallow the rule. Permitting the Defendant's indictment to stand would grant immigration enforcement officers carte blanche to evade the requirements of the Fourth Amendment by manufacturing a felony during a *Terry* stop. In short, the indictment offends due process.

## CONCLUSION

For the reasons stated above, the Defendant's Motion to Dismiss Counts for Inability to Prove a Charge (ECF No. 37) is **GRANTED**.

The Defendant's Motion to Suppress and Motion to Dismiss for Constitutional Violation (ECF No. 38) is **GRANTED**.

It is so **ORDERED**.

**SIGNED** this 20th day of October, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE